# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-1734

_____

United States of America,             *
                                       *
          Plaintiff - Appellee,        *
                                       *   Appeal from the United States
     v.                                *   District Court for the Western
                                       *   District of Missouri.
Maurice Kendell Griffith,              *
                                       *
          Defendant - Appellant.       *

_____

Submitted: December 10, 2007
Filed: July 21, 2008

_____

Before BYE, JOHN R. GIBSON, and MELLOY, Circuit Judges.

_____

BYE, Circuit Judge.

Maurice Kendall Griffith appeals the district court's[1] denial of his motion to suppress a firearm seized during the search of a vehicle in which he was a passenger, and statements he made to police identifying himself and acknowledging ownership of the firearm. We affirm.

_____

[1]The Honorable Nanette K. Laughrey, United States District Judge for the Western District of Missouri.

I

On September 1, 2005, at approximately 8:30 p.m., Columbia Missouri police observed Griffith and Vickie Holmes-Belcher sitting in a car parked in the parking lot of a housing development owned by the Columbia Public Housing Authority. Belcher, the owner of the vehicle, was in the driver's seat and Griffith was in the front passenger seat. The vehicle had been backed into a parking spot and its lights were off.

The housing area has a history of attracting drug-related activity and police were under orders to conduct regular patrols and exclude persons whose names appeared on a "trespass list" compiled by the housing authority. The officers initially drove past the vehicle but returned moments later. They parked their patrol vehicle approximately thirty feet from Belcher's vehicle and approached the occupants. The patrol vehicle did not block the exit to the parking lot and its location did not interfere with Belcher's ability to drive away.

One of the officers approached the driver's window and spoke with Belcher. The other walked around to the back of the vehicle as a safety precaution. Belcher identified herself and told police she did not know anyone in the housing area and did not live there. She initially stated she was on her way home but later told the officer she was "just driving around." When asked the identity of her passenger, Belcher would only say the person was a friend.

Unsatisfied with Belcher's responses, the officer asked her to exit her vehicle. The officer again asked about the identity of the passenger and Belcher said he was an acquaintance who had flagged her down. She identified him only by his street name – "Black." The officer considered Belcher's answers evasive and noted she appeared irritated, so he directed her to sit on the curb while he questioned the passenger. As the officer approached the vehicle, he and his partner observed Griffith

lean forward as if putting something under the front seat. The officers placed their hands on their weapons and ordered Griffith to show his hands. One of the officers approached the window and asked Griffith to identify himself. Griffith provided his name and date of birth, and when asked if he was on the housing authority "trespass list," told the officer: "Why don't you just find out." A check of the trespass list confirmed Griffith was banned from the property, and he was arrested for trespassing. Officers searched Belcher's car incident to the arrest and discovered a loaded .25-caliber handgun under the passenger seat. Belcher denied knowledge of the handgun.

At the police station, Griffith was briefly placed in a holding cell and, because he had resisted earlier attempts to search his person, was strip searched. A short while later, he was booked, fingerprinted, and verbally advised of his Miranda[2] warnings. One of the officers testified there were Miranda warning forms available for defendants to sign but it was common practice to proceed without a signed waiver. After agreeing to talk, and initially denying the handgun was his, Griffith stated he had driven to Kansas City that day to pick up the handgun from a friend. After fifteen to twenty minutes of questioning, Griffith invoked his right to remain silent.

Griffith was charged with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). He moved to suppress the handgun and his statements identifying himself and admitting ownership of the handgun. Griffith argued the handgun and statements were products of an illegal detention because the police did not have a reasonable articulable suspicion sufficient to detain and question him and Belcher. The magistrate judge[3] conducted an evidentiary hearing and concluded the initial questioning of Belcher and Griffith was consensual and did not require any reasonable articulable suspicion. Further, based on Belcher's contradictory and

---

[2]Miranda v. Arizona, 384 U.S. 436 (1966).

[3]The Honorable William A. Knox, United States Magistrate Judge for the Western District of Missouri.

evasive statements and Griffith's suspicious movements in the vehicle, the police were justified in conducting a Terry[4] stop, which included questioning Griffith. Finally, once police determined Griffith had been excluded from the property, they had probable cause to arrest him and search the vehicle incident to arrest. The magistrate judge also found police had advised Griffith of his rights under Miranda, and he freely and voluntarily admitted possessing the handgun.

The district court adopted the magistrate judge's report and recommendation and denied the motion to suppress. Griffith was tried and convicted. On appeal, he argues the district court erred in refusing to suppress the handgun and his statements.

II

We review a district court's factual determinations supporting the denial of a motion to suppress for clear error and its conclusions of law de novo. United States v. Velazquez-Rivera, 366 F.3d 661, 664 (8th Cir. 2004).

A

Griffith first contends the handgun and his statements should be suppressed because they flowed from an illegal detention. Not all encounters between law enforcement officials and citizens implicate the protections of the Fourth Amendment. Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968). A consensual encounter between an officer and a private citizen does not raise Fourth Amendment concerns. Florida v. Rodriguez, 469 U.S. 1, 5-6 (1984). Even if the officers did not suspect criminal activity, the Fourth Amendment would not prohibit asking questions if the encounter was consensual before cause for a Terry stop arose.

---

[4]Terry v. Ohio, 392 U.S. 1 (1968).

-4-

Determining which police-citizen contacts fall within the protections of the Fourth Amendment and which do not is fact intensive and turns on the unique facts of each case. United States v. Hathcock, 103 F.3d 715, 718 (8th Cir. 1997). "[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." United States v. Mendenhall, 446 U.S. 544, 554 (1980). We consider these matters on a case-by-case basis, as "[n]o litmus-paper test exists for distinguishing a consensual encounter from a seizure." United States v. Ninety One Thousand Nine Hundred Sixty Dollars, 897 F.2d 1457, 1461 (8th Cir. 1990). "The test is necessarily imprecise, because it is designed to assess the coercive effect of police conduct, taken as a whole, rather than to focus on particular details of that conduct in isolation." Michigan v. Chesternut, 486 U.S. 567, 573 (1988). Some circumstances which inform our decision-making include: officers positioning themselves in a way to limit the person's freedom of movement, United States v. White, 890 F.2d 1413, 1416 (8th Cir. 1989), the presence of several officers, the display of weapons by officers, physical touching, the use of language or intonation indicating compliance is necessary, the officer's retention of the person's property, or an officer's indication the person is the focus of a particular investigation, Ninety One Thousand Nine Hundred Sixty Dollars, 897 F.2d at 1461 (citing Mendenhall, 446 U.S. at 554, United States v. Campbell, 843 F.2d 1089, 1093 (8th Cir. 1988), and United States v. Nunley, 873 F.2d 182, 185 (8th Cir. 1989)); see also Florida v. Royer, 460 U.S. 491, 503 n.9 (1983) (noting officers taking possession of defendant's airline ticket, luggage, and identification contributed to determination defendant had been seized because "[a]s a practical matter, Royer could not leave the airport without them.").

The district court found the actions of the officers in connection with the initial encounter were insufficient to lead a reasonable person to believe his liberty was restrained. Belcher and Griffith made no attempt to leave or avoid the initial encounter, and the officers did not block the parking lot exit or impede Belcher's

ability to drive away. When the officers approached the vehicle they did not draw their weapons, touch, intimidate the occupants, or demand they comply with the investigation. These findings by the district court are not clearly erroneous, and our de novo review of its legal conclusions confirms the initial encounter was consensual.

We further conclude, based on the totality of the circumstances, the officers were warranted in expanding the scope of the encounter to a Terry stop. See United States v. Hughes, 517 F.3d 1013, 1016 (8th Cir. 2008) (holding we look at the totality of the circumstances to determine whether an investigatory stop and search was justified). In Terry v. Ohio, the Supreme Court held officers may conduct brief investigatory stops of individuals if they have a reasonable articulable suspicion of criminal activity. 392 U.S. at 30. Reasonable suspicion does not, however, exist solely on the basis of an officer's hunch. United States v. Fuse, 391 F.3d 924, 929 (8th Cir.2004). To satisfy the Fourth Amendment, officers must be able to articulate some minimal, objective justification for a Terry stop. Id.

Here, the officers were patrolling an area known for drug trafficking when they observed Belcher's vehicle. The occupants gave no indication they were in the process of entering or exiting the vehicle, and appeared to observe the officers closely as they passed by. When the officers questioned Belcher she became agitated, gave conflicting reasons for her presence on housing authority property, and refused to identify her passenger. Finally, when the officers approached the vehicle to speak with Griffith he was observed reaching under the front seat as if attempting to hide something. Under the circumstances, the officers were justified in conducting a Terry stop to determine Griffith's identity. Thereafter, it was determined Griffith was trespassing and police had probable cause to arrest him and search the vehicle. For these reasons, we conclude Griffith's statement identifying himself, and the search of the vehicle, were not the result of an illegal detention.

B

Griffith next argues his statement at the police station admitting ownership of the handgun was not knowingly and voluntarily given and should be suppressed.

"Consent is voluntary if it was 'the product of an essentially free and unconstrained choice by its maker, rather than the product of duress or coercion, express or implied.'" United States v. Bradley, 234 F.3d 363, 366 (8th Cir. 2000) (quoting United States v. Chaidez, 906 F.2d 377, 380 (8th Cir. 1990)). In determining whether consent was voluntary, we look at the totality of the circumstances, "including 'both the characteristics of the accused and the details of the interrogation.'" Id. (quoting Chaidez, 906 F.2d at 380-81). Suspects' characteristics which may be relevant include:

> (1) their age; (2) their general intelligence and education; (3) whether they were intoxicated or under the influence of drugs when consenting; (4) whether they consented after being informed of their right to withhold consent or of their Miranda rights; and (5) whether, because they had been previously arrested, they were aware of the protections afforded to suspected criminals by the legal system.

Id. (citing Chaidez, 906 F.2d at 381).

Relevant characteristics of the environment in which consent was given include:

> [W]hether the person who consented (1) was detained and questioned for a long or short time; (2) was threatened, physically intimidated, or punished by the police; (3) relied upon promises or misrepresentations made by the police; (4) was in custody or under arrest when the consent was given; (5) was in a public or a secluded place; or (6) either objected to the search or stood by silently while the search occurred.

Id. (citing <u>Chaidez</u>, 906 F.2d at 381). These factors are not applied mechanically, but serve to guide our analysis. <u>Chaidez</u>, 906 F.2d at 381.

Considering the totality of the circumstances, there was no error in the district court concluding Griffith's statement was voluntarily given. As noted above, the initial encounter with police at the parking lot was not unduly coercive. Additionally, Griffith is an adult who was given his <u>Miranda</u> warnings and agreed to speak to the police.[5] The interrogation took place in the police department but there is no evidence the police threatened him, intimidated him, or caused him to rely on any promises or misrepresentations. Further, there is no evidence Griffith was intoxicated or under the influence of drugs. Finally, his history of arrests and interaction with the criminal justice system indicate he was familiar with his right to remain silent, a right he asserted after making the incriminating statements. Thus, we conclude Griffith's post-arrest statements were knowing and voluntary.

## III

The judgment of the district court is affirmed.

_____

---

[5]Griffith complains police did not present him with a written waiver form but does not dispute he was read his <u>Miranda</u> warnings.