# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 11-1372

———————

United States of America,       \*
                                          \*

             Appellant,    \*

                                          \*   Appeal from the United States

       v.                   \*   District Court for the

                                          \*   District of Nebraska.

Luis Alberto Aquino,       \*

                                          \*

             Appellee.     \*

———————

Submitted: November 15, 2011
Filed: March 22, 2012

———————

Before RILEY, Chief Judge, BEAM and BYE, Circuit Judges.

———————

BYE, Circuit Judge.

The district court[1] granted Luis Aquino's motion to suppress evidence discovered on his person during an encounter with law enforcement officers at the Greyhound Bus Depot in Omaha, Nebraska. The district court found Aquino did not voluntarily consent to the search that resulted in the discovery of the evidence. The government appeals contending the evidence was lawfully obtained as a result of a consensual encounter. We affirm.

———————

[1]The Honorable Joseph F. Bataillon, United States District Judge for the District of Nebraska, adopting the report and recommendation of the Honorable Thomas D. Thalken, United States Magistrate Judge for the District of Nebraska.

# I

Four officers involved in the Commercial Interdiction Unit (CIU) of the Nebraska State Patrol met at the Omaha Bus Depot on February 8, 2010, to intercept people who may be transporting controlled substances or illegal items while riding the bus. A Greyhound bus arrived from Denver on its way to Chicago with Aquino as one of its passengers. When the bus parked next to the terminal for servicing, the CIU officers observed the passengers as they exited the bus to enter the terminal.

Two CIU officers, Scott and Rasgorshek, followed one of the bus passengers as he walked through the main terminal and back outside to the terminal's north portico. A third CIU officer, Lutter, followed the two officers to observe any activity around the two officers as they contacted the bus passenger. As the first two officers were speaking to the passenger on the north side of the terminal, Lutter noticed Aquino taking an interest in the encounter. Lutter saw Aquino talking on his cell phone, and thought Aquino was commenting on the first two officers' encounter with the passenger. Scott and Rasgorshek finished their encounter with the first passenger and reentered the terminal to speak with a second passenger. Lutter noticed Aquino also take an interest in the officers' encounter with a second bus passenger.

Lutter then left the bus terminal to assist the fourth CIU officer, Orduna, with a suspicious bag next to the bus. As the passengers were re-boarding the bus, the officers stood by the bus door asking each passenger if the bag was theirs. When Aquino passed by the officers, he stated the bag was not his. When a different passenger claimed ownership of the bag, Orduna and Rasgorshek began to talk with that passenger. Lutter entered the bus and immediately approached Aquino, who was seated about half-way to the back of the bus on the driver's side. Lutter, who is 6' 6" tall and weighs 240 pounds, stepped past Aquino and then turned back, showing Aquino his identification as a law enforcement officer. Scott accompanied Lutter, kneeling on a seat on the opposite side of the bus, approximately two rows in front

of where Aquino was seated. Both Scott and Lutter focused only on Aquino, and did not approach any other bus passengers. Lutter told Aquino he was a law enforcement officer. He then explained that no one was in trouble and no one was under arrest, but wondered if Aquino would talk to him. Aquino asked if he had to get off the bus. Lutter told Aquino he did not have to exit the bus unless he wanted to do so. Aquino remained in his seat.

Lutter first asked Aquino about his travel itinerary. Aquino informed him he was traveling from Merced, California, to Des Moines, Iowa. Aquino also gave Lutter his bus ticket after being asked to do so. Lutter noted the ticket was for a one-way passage and had been paid for in cash. Lutter next asked Aquino for some identification. Aquino gave Lutter a California ID. Lutter returned the ticket and the ID to Aquino after looking at them. By this time, the original passengers coming from Denver had all re-entered the bus and the bus driver had begun boarding the new passengers from Omaha. Lutter's conversation with Aquino did not delay the bus's departure as the driver was still preparing for departure.

At this point in the encounter, Lutter informed Aquino he was watching for people at the bus station who may be transporting controlled substances or illegal items such as bombs or knives. Lutter specifically informed Aquino that he wanted to talk to him because he noticed his actions in the terminal while watching two of the officers speak to other passengers, and because Aquino appeared to be nervous while observing the officer/passenger encounters. Lutter then asked Aquino if he had any bags. Aquino said he did. Lutter asked Aquino to exit the bus and show him his bag. Aquino walked off the bus followed by Lutter. Scott also exited the bus with Lutter and Aquino.

After exiting the bus, the men first went to the passenger side of the bus to look in the undercarriage area, which was filled with freight but no bags. The group then walked to the driver's side of the bus where Aquino located his bag in the

undercarriage luggage area. Lutter asked Aquino if he could search both the bag and Aquino's person. Aquino agreed to let the officer search his bag. Lutter then asked if he could conduct a pat-down search of Aquino's person. Aquino said he did not want the officer to touch him. Lutter then asked Aquino if he would unzip his coat and hold his clothing next to his body so that Lutter could tell if there was anything secured under his clothing. Aquino opened his jacket and pulled his clothing tight to his body. Lutter observed nothing unusual. Lutter then asked Aquino to do the same thing with his dark-colored, baggy jeans. Aquino complied by pulling the thigh area tight on both pant legs, but not the lower portion of the leg area. Lutter said Aquino appeared to be very nervous and fidgety at this point, and was unable to maintain eye contact with him.

Lutter next asked Aquino to pull the lower portion of his pant legs tight around his ankles and calf area. Aquino made half-attempts to do so by using only one hand on each leg. At this point, Lutter noticed an unnatural bulge on the inside of Aquino's right calf. Lutter then asked Aquino to lift his pants up above the bulge. Aquino refused. Lutter then placed Aquino in handcuffs, testifying he did so as a precautionary safety measure. Without first conducting a pat down, Lutter immediately lifted Aquino's pant leg above the bulge and saw a duct-taped bundle strapped on Aquino's right leg. Based upon his training and experience,[2] Lutter believed the now-revealed bundle contained a controlled substance. Aquino was then escorted into the rear office area of the bus terminal and advised of his Miranda rights. Aquino declined to waive his rights and asked for an attorney. At this point, the package was removed from Aquino's right leg and his body was further searched. Two other packages were found taped to Aquino, one on his left leg and one in his crotch area. All of the packages contained methamphetamine. The officers had

---

[2]Lutter testified he is involved in twenty-five to forty-eight arrests per year in which items have been duct-taped to a person's body. In all such cases, the items contained a controlled substance or other contraband.

Aquino transported to the Douglas County Corrections Center where he was booked for possession with intent to deliver methamphetamine. Lutter testified his conversation with Aquino lasted for ten to fifteen minutes. Scott testified the entire episode lasted for twenty to twenty-five minutes.

On June 23, 2010, a federal grand jury returned a one-count indictment against Aquino charging him with possession with intent to distribute at least 50 grams but less than 500 grams of a mixture or substance containing methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) & 841(b)(1). After pleading not guilty, Aquino filed a motion to suppress the evidence found during his encounter with Investigator Lutter. The matter was assigned to a magistrate judge for a report and recommendation. Following a hearing, the magistrate judge recommended the motion be granted.

The magistrate judge determined the encounter was not a purely consensual encounter because no reasonable person in Aquino's position would have felt free to end the encounter. The magistrate judge found the encounter was an investigative detention that was not supported by reasonable suspicion. After the government objected to the magistrate judge's recommendation, the district court reviewed the matter. The government did not challenge the magistrate judge's determination regarding the lack of reasonable suspicion, but argued the encounter was entirely consensual up until the point when Lutter placed handcuffs on Aquino, citing United States v. Favela, 247 F.3d 838 (8th Cir. 2001). The district court distinguished Favela, however, and determined this case was similar to United States v. Eustaquio, 198 F.3d 1068 (8th Cir. 1999), and United States v. Green, 52 F.3d 194 (8th Cir. 1995), which concluded initial consensual encounters became investigatory stops that required reasonable suspicion. The district court found it would have been reasonable for Aquino to assume Lutter's statements were commands, not requests, which together with the fact that Lutter never told Aquino he was free to leave and did not have to answer Lutter's questions, indicated the encounter was not free of coercion.

-5-

The district court focused in part upon the pointed questions the officer asked Aquino, and the fact the officer targeted Aquino for questioning because of his behavior inside the terminal. Ultimately, the district court agreed the encounter was an investigative detention that required reasonable suspicion, and overruled the government's objection to the magistrate judge's recommendation.

The government filed a timely appeal. On appeal, the government does not challenge the district court's determination regarding the lack of reasonable suspicion, but renews its contention the encounter between Lutter and Aquino was consensual up until the moment the officer handcuffed the defendant.

II

"We review a district court's decision to grant a suppression motion de novo while reviewing the underlying factual determinations for clear error." United States v. Logan, 362 F.3d 530, 532 (8th Cir. 2004) (citing United States v. Walker, 324 F.3d 1032, 1036 (8th Cir. 2003)). The question whether Aquino voluntarily consented to a search of his person is a question of fact. United States v. Sanders, 341 F.3d 809, 818 (8th Cir. 2003). "A district court's finding of fact is clearly erroneous only when, 'although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" Tripp v. W. Nat'l Mut. Ins. Co., 664 F.3d 1200, 1205 (8th Cir. 2011) (quoting Sanders, 341 F.3d at 818).

The Fourth Amendment "is not triggered by a consensual encounter between an officer and a private citizen." United States v. Villa-Gonzalez, 623 F.3d 526, 531 (8th Cir. 2010). An encounter which is initially consensual, however, can become non-consensual and therefore "implicat[e] the Fourth Amendment when, considering the totality of the circumstances, the questioning is so intimidating, threatening, or coercive that a reasonable person would not have believed himself free to leave" or

to end the encounter. Id. at 532 (citations and internal quotations omitted). We consider seven non-exclusive factors when examining the totality of the circumstances, which are:

> [O]fficers positioning themselves in a way to limit the person's freedom of movement, the presence of several officers, the display of weapons by officers, physical touching, the use of language or intonation indicating compliance is necessary, the officer's retention of the person's property, or an officer's indication the person is the focus of a particular investigation.

United States v. Griffith, 533 F.3d 979, 983 (8th Cir. 2008) (internal citations omitted). "Determining which police-citizen contacts fall within the protections of the Fourth Amendment and which do not is fact intensive and turns on the unique facts of each case." Id. (citing United States v. Hathcock, 103 F.3d 715, 718 (8th Cir. 1997)). Ultimately, "[t]he government bears the burden of proving voluntary consent." United States v. Quintero, 648 F.3d 660, 667 (8th Cir. 2011).

The government contends the dispositive issue in this case is whether Aquino's compliance with Lutter's request to pull the bottom portion of his pant leg tight against his body was a consensual act which gave rise to reasonable suspicion when Lutter noticed the concealed bulge, in turn justifying a subsequent investigatory detention. We disagree. This case turns not on Aquino's last act before being handcuffed, but rather Lutter's first act after placing Aquino in handcuffs, which was to lift Aquino's pant leg to reveal the concealed bulge. Under the circumstances involved in this case, Lutter violated the Fourth Amendment when he searched underneath an article of Aquino's clothing without his consent and without probable cause to do so, instead of performing a pat down to confirm whether the concealed bulge was a weapon.

To begin our analysis, we start with three noncontroversial and well-established principles of Fourth Amendment jurisprudence. First, the scope of an investigatory detention under Terry v. Ohio, 392 U.S. 1 (1968), is limited. See, e.g., United States v. Fisher, 364 F.3d 970, 973 (8th Cir. 2004) ("An investigative stop must be limited in scope and manner to satisfy the requirements of Terry."). While an officer may conduct a limited, warrantless search of a suspect "if he has a reasonable, articulable suspicion that the person may be armed and presently dangerous," the scope of such a search "must be confined to a search reasonably designed to discover concealed weapons." United States v. Roggeman, 279 F.3d 573, 577 (8th Cir. 2002). "[T]he 'sole justification' for such a search is the protection of the officer and others[.]" Id. (quoting Terry, 392 U.S. at 29). Because of the limited scope of an investigatory detention under Terry, officers "must use the least intrusive means that are reasonably necessary" to protect officer safety. United States v. Correa, 641 F.3d 961, 967 (8th Cir. 2011) (internal quotation marks and citations omitted); see also United States v. Navarrete-Barron, 192 F.3d 786, 790 (8th Cir. 1999) ("Officers must, however, employ the least intrusive means of detention and investigation, in terms of scope and duration, that are reasonably necessary to achieve the purpose of the Terry stop.").

Second, where an officer exceeds the permissible scope of Terry, the investigatory detention is transformed into an arrest. See Peterson v. City of Plymouth, Minn., 945 F.2d 1416, 1419 (8th Cir. 1991) (listing the factors a court should consider "[i]n determining whether an officer's conduct during a purported investigatory stop exceeded the scope justified under the circumstances, thereby transforming the stop into an arrest"); see also United States v. Maltais, 403 F.3d 550, 556 (8th Cir. 2005) (addressing whether an investigatory detention exceeded the permissible scope of Terry due to its length and became a "*de facto* arrest").

Third, a Terry stop that becomes an arrest must be supported by probable cause. United States v. Smith, 648 F.3d 654, 659 (8th Cir. 2011); United States v. Newell, 596 F.3d 876, 879 (8th Cir. 2010); Navarrete-Barron, 192 F.3d at 790.

In addition to these three general principles of Fourth Amendment law, we discuss a fourth established principle which applies to the particular circumstances involved in this case. Several of our prior decisions (some of which also involve Investigator Lutter's conduct) address whether an officer's mere observation of a concealed bulge under a person's article of clothing establishes probable cause to believe the person is trafficking drugs. These decisions indicate an officer's observation of a concealed bulge, standing alone, does not amount to probable cause to support an arrest.

In Eustaquio, we held Lutter's observation of a concealed but yet-to-be-revealed bulge did not even support a reasonable suspicion to conduct a Terry investigatory detention, let alone support probable cause for an arrest. 198 F.3d at 1071. The government contended eight factors, including Lutter's initial observation of a concealed bulge, gave rise to reasonable suspicion.[3] We disagreed, stating

_____

[3]The eight factors considered in Eustaquio were:

(1) defendant's exhibiting nervous movement and a straight-ahead gaze; (2) defendant's choice of a direct path to leave the terminal; (3) defendant's not having any checked luggage; (4) defendant's arrival from a source city for narcotics trafficking; (5) defendant's same-day purchase of a one-way airline ticket with cash; . . . (6) the fact that there were no friends and family meeting defendant at the airport. . . . (7) defendant's doing the opposite of what Lutter asked, and pulling her shirt outward instead of toward her body; and (8) any bulge that Lutter might have seen.

Eustaquio, 198 F.3d at 1070-71.

"[e]ven if we accept the government's position that no detention and seizure occurred until Lutter touched the defendant, we hold this detention was not supported by articulable reasonable suspicion." Id. at 1071.

In United States v. Tovar-Valdivia, 193 F.3d 1025 (8th Cir. 1999), we held an officer did not have probable cause to support an arrest not only after he observed a concealed bulge, but also touched the bulge without confirming the presence of a weapon or contraband. Id. at 1028. We said "[t]he bulges could have been bandages about his body, a money belt worn about his ribs, or any number of non-contraband items." Id.

In United States v. Jones, 254 F.3d 692 (8th Cir. 2001), we concluded "Lutter's determination that Jones had a bulge under his clothing that was not part of his body did not give Lutter probable cause to arrest and search Jones." Id. at 697. Jones involved not only Lutter's initial observation of a concealed bulge, but also his act of touching the bulge with the suspect's consent. Id. at 694. Under the facts present in Jones, we concluded Lutter's consensual act of touching the bulge did "not supply any new facts supporting probable cause" to supplement Lutter's initial observation of the concealed bulge. Id. at 698. Jones analyzed the holdings in Tovar-Valdivia and Eustaquio, and concluded the two cases stood for the legal proposition that "the mere presence of a bulge under a person's clothing, which is not part of the person's anatomy, [does not] amount[] to evidence of drug possession." Id.

Finally, in Favela, the primary case relied upon by the government, we held an officer's initial observation of concealed bulges, coupled with his subsequent act of touching the bulges, were done with the defendant's consent. 247 F.3d at 840. The officer placed the defendant under arrest because he believed the bulges to be illegal drugs after touching them with the defendant's consent. Id. at 839. Thus, Favela stands only for the proposition that probable cause supports an arrest where a consensual touching of a bulge confirms the presence of contraband. See also United

States v. Mendoza-Cepeda, 250 F.3d 626, 628 (8th Cir. 2001) (affirming the denial of a suppression motion where the suspect consented to the officer touching a concealed bulge).

None of our prior cases have concluded the mere observation of a concealed bulge, standing alone, establishes probable cause to support an arrest. Instead, we have required the officer's initial observation of a concealed bulge to be buttressed by a *permissible* touching of the bulge, see Favela, 247 F.3d at 840, which then may give rise to probable cause *if* touching the bulge makes the presence of contraband "immediately apparent." Minnesota v. Dickerson, 508 U.S. 366, 375 (1993).

We turn now to an examination of the facts in this case. The parties dispute whether Aquino's act of pulling his pant leg tight was a consensual act. If we apply the legal principles discussed above to the facts of this case, the parties' factual dispute is irrelevant because of the operative facts which *are not* in dispute. First, the government does not dispute Aquino never consented to Lutter touching him. The government therefore does not claim, and the facts will not support a claim, that Lutter's act of searching under Aquino's pant leg to reveal the concealed bulge was done with Aquino's consent. Second, the government does not dispute Lutter never performed a pat down before searching under Aquino's clothing to reveal the concealed bulge.

The government contends Lutter's act of handcuffing Aquino after observing the concealed bulge only initiated an investigatory detention, not an arrest, and was done as a precautionary safety measure. Even if we assume that to be true, Lutter exceeded Terry's limited scope after placing Aquino in handcuffs. Instead of conducting a pat down to determine if the concealed bulge on Aquino's leg was a weapon which might threaten his safety, Lutter immediately performed a more intrusive search by lifting Aquino's pant leg to examine his leg underneath his clothing.

-11-

Searching under articles of clothing, whether it be a man's pant leg or a woman's blouse, is necessarily more intrusive than a pat down. Such a search is thus not the "least intrusive means" necessary to protect an officer's safety, and exceeds the permissible limits of a Terry investigatory detention. Correa, 641 F.3d at 967. An actual search of a person's body is not authorized under Terry until *after* a pat down confirms the presence of a weapon or contraband. See Tovar-Valdivia, 193 F.3d at 1028 n.1 ("[N]or does Terry authorize the police officer to handcuff and search an individual *after the initial pat-down* of the bulge did not confirm the existence of a weapon or contraband.") (emphasis added); see also United States v. Craft, 30 F.3d 1044, 1045 (8th Cir. 1994) (affirming the denial of a suppression motion where an officer conducted a consensual pat down *prior* to lifting a defendant's pant leg to reveal the presence of contraband taped to his ankles).

We see no basis for distinguishing the facts of this case from those where the Fourth Amendment is violated when an officer immediately reaches inside a suspect's pocket to retrieve a weapon or contraband without first conducting a pat down. See, e.g., United States v. Casado, 303 F.3d 440, 448-49 (2d Cir. 2002). As the Second Circuit eloquently noted, a search inside one's clothing (or under it in this case) is necessarily more intrusive than a pat down, and the difference between the two types of searches has constitutional significance:

> Terry, Sibron, and their progeny teach that the Fourth Amendment protects [a person] against an intrusion into his privacy either by a patdown or by an invasion of his clothing, but that the latter is more serious than the former, and that this difference has constitutional significance. Accord United States v. Vasquez, 638 F.2d 507, 521 (2d. Cir.1980) (asserting in dicta that "if a weapon is feared, a 'pat down' may suffice, and make unreasonable an actual search of the individual's pockets," citing Sibron, 392 U.S. at 65, 88 S.Ct. 1889). We conclude that, as a matter of law on this record, [the officer] could have protected his safety and the safety of others by employing the less serious intrusion, a patdown, that the method was obvious and well known to

-12-

him, and that there is no valid reason apparent on the record for his not using it. We therefore hold that the failure to use the patdown in these circumstances rendered the search "unreasonable."

Id. at 449 (internal footnote omitted).

There are situations where concern for an officer's safety may justify by-passing a pat down during an investigatory detention. See id. ("We do not exclude the possibility that in some circumstances a patdown is not required."); see also Adams v. Williams, 407 U.S. 143, 144-48 (1972) (concluding an officer who "was alone early in the morning on car patrol duty in a high-crime area" and investigating a reliable tip that a suspect "was carrying narcotics and had a gun at his waist" acted reasonably when he reached into the suspect's open car window and removed a loaded weapon from the suspect's waistband without first conducting a pat down); United States v. Baker, 78 F.3d 135, 137-38 (4th Cir. 1996) (concluding an officer who noticed a bulge underneath the front of a suspect's shirt acted reasonably by directing the suspect to raise his shirt instead of conducting a pat down because of "the inordinate risk of danger to law enforcement officers during traffic stops" and because the request "allowed [the officer to immediately determine whether [the suspect] was armed without having to come in close contact with him").

As we noted earlier, however, the reasonableness of an intrusion into rights protected by the Fourth Amendment "turns on the unique facts of each case[,]" Griffith, 533 F.3d at 983, and no valid reason is apparent on this record which justified Lutter 's act of immediately searching underneath Aquino's clothing instead of first conducting a pat down to determine whether the concealed bulge was a weapon. This was not a rapidly evolving situation where Aquino made a furtive gesture which may have given Lutter reason to believe his safety was threatened by a readily accessible weapon. In addition, Aquino was already in handcuffs at the time of Lutter's search. Thus, concern for officer safety did not justify by-passing a pat

down under the circustances involved in this case. As a result, Lutter transformed the investigatory <u>Terry</u> detention into an arrest when he lifted Aquino's pant leg. Under the well-established principles of law discussed above, Lutter thus needed probable cause to support Aquino's arrest and the subsequent non-consensual search of his person.

Probable cause was not present when Lutter lifted Aquino's pant leg. At that point in time, Lutter had only observed a concealed bulge under Aquino's clothing. The government does not challenge the district court's determination that Aquino's conduct, up until the moment Lutter observed the concealed bulge, did not support reasonable suspicion, let alone probable cause, and our prior cases clearly establish an officer's observation of a concealed bulge, without more, does not suffice for probable cause. In <u>Jones</u> and <u>Favela</u>, an officer's initial observation of a concealed bulge was buttressed by his subsequent touching of the bulge *with the suspect's consent* which then confirmed the presence of contraband. In this case, however, Lutter did not have Aquino's consent to touch the bulge or to search underneath his clothing.

In sum, Lutter's act of immediately searching Aquino's body underneath his clothing, rather than conducting a pat down, exceeded the permissible scope of <u>Terry</u>. As a result, Lutter's conduct in handcuffing Aquino and searching under his clothing must be analyzed as an arrest which required probable cause, rather than as an investigatory detention which required reasonable suspicion. Under the facts of this case, Lutter did not have probable cause before performing the non-consensual search of Aquino's person, and thus the district court did not err in suppressing the evidence discovered during the search.

III

For the reasons stated above, we affirm the district court.

———————————————————