# United States Court of Appeals
### For the Eighth Circuit
_____

No. 22-2670
_____

United States of America

*Plaintiff - Appellee*

v.

Sergio Jimenez

*Defendant - Appellant*
_____

Appeal from United States District Court
for the District of Nebraska - Omaha
_____

Submitted: May 11, 2023
Filed: July 28, 2023
_____

Before SHEPHERD, STRAS, and KOBES, Circuit Judges.
_____

SHEPHERD, Circuit Judge.

Sergio Jimenez was charged with possession with intent to distribute 50 grams or more of methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1), after law enforcement found more than 1,500 grams of methamphetamine concealed in a vest on his person. He filed a motion to suppress, arguing that his detention and frisk were not supported by reasonable suspicion. The district court denied the

motion. Jimenez entered a conditional plea, reserving his right to appeal the suppression ruling. Having jurisdiction under 28 U.S.C. § 1291, we now reverse.

I.

On September 24, 2020, several plainclothes officers with Nebraska State Patrol were conducting routine interdiction operations at the Trailways bus station in Omaha. At approximately 6:00 a.m., a bus arrived from Denver, Colorado. All of the passengers disembarked so the company could conduct a driver change before continuing on to the next destination. After all the passengers had exited the bus, Drug Enforcement Administration Task Force Officer (TFO) Nicholas Bonney noticed Jimenez struggling to find something in his duffle bag. TFO Bonney approached Jimenez and asked whether Jimenez needed a flashlight, to which Jimenez responded yes. TFO Bonney shined his flashlight into the bag, Jimenez found the boarding pass he was looking for, and Jimenez went on his way.

TFO Bonney paused, however, because in assisting Jimenez with the flashlight, TFO Bonney noticed that Jimenez's bag contained only minimal clothing, "maybe a day's worth." But TFO Bonney also knew that, while passengers waited for Trailways to conduct its driver change, they were not required to remove their luggage from the bus, and in fact, many would leave their bags in the luggage compartment below the bus or in the storage bins above their seats. TFO Bonney did not ask Jimenez whether he had any other bags or clothing. Beyond the minimal amount of clothing, TFO Bonney also found it suspicious that Jimenez had a blanket draped over his shoulders in a cape-like fashion, concealing all but the middle third of his body, as no one else was wearing a blanket. However, he observed passengers wearing jackets or parkas, and video footage confirms many passengers were wearing such attire, some even wearing stocking caps.

TFO Bonney mulled over his suspicions for a few minutes and decided to approach Jimenez again to ask questions about his itinerary. He attempted to record this encounter using the camera attached to his hat, but it failed to turn on because

he had forgotten to charge it the night before. Nonetheless, he approached Jimenez, identified himself as an investigator, and asked whether Jimenez would mind speaking with him. Jimenez had no objections, so TFO Bonney began by asking where Jimenez's trip had started. Jimenez responded that he had started his trip in Colorado and was going to Iowa to visit his uncle for a week. When TFO Bonney asked who purchased his ticket, Jimenez initially said he purchased it himself. TFO Bonney then requested to see Jimenez's identification. Jimenez handed TFO Bonney his California driver's license, which matched the name on his ticket. When TFO Bonney asked whether Jimenez's uncle had actually purchased the ticket for him, Jimenez responded yes; his uncle had done so when he arrived in Colorado. TFO Bonney found Jimenez's inconsistency regarding who purchased the ticket suspicious.

TFO Bonney also found it strange that Jimenez's trip started in Colorado given that he possessed a California driver's license. When TFO Bonney asked Jimenez to explain, Jimenez responded that he actually started his trip in Bakersfield, California, because that is where his mother lives. The story did not add up to TFO Bonney, and this combined with his knowledge that Colorado and California are considered "source states" for drugs raised his suspicions further. As a result, he asked to search Jimenez's duffle bag and backpack, and Jimenez readily consented. Jimenez first handed TFO Bonney his duffle bag, and then "shimmied" his backpack off underneath his blanket and handed it to TFO Bonney as well. There was no contraband in either bag. Suddenly, an unrelated confrontation arose in the front of the bus terminal, and TFO Bonney left to address it.

After addressing the incident, TFO Bonney discussed his observations of Jimenez with another investigator at the bus station, TFO Nick Jaworski, and decided to approach Jimenez for a third time. TFO Bonney requested TFO Jaworski accompany him to record the interaction with his hat camera. The pair then approached Jimenez; TFO Bonney spoke to him and TFO Jaworski stood nearby and activated his camera to record the interaction. The video reveals that, as the officers approached, Jimenez was standing in line, leaning against the wall, waiting

to reboard the bus. He was still wearing his blanket draped over his shoulders, but his hands were outside of it on his cellphone and remained there throughout the encounter.

TFO Bonney began by telling Jimenez that he was still not in trouble, but that TFO Bonney had a couple more questions, particularly about Jimenez's itinerary. Jimenez explained his itinerary again, stating that he started his trip in Colorado, then went to California to visit his mother, and was on his way back to Iowa to visit his uncle. TFO Bonney then asked, "You don't have anything on your person do you?" to which Jimenez responded, "No." Not satisfied, TFO Bonney requested to conduct a search of Jimenez's person. Jimenez declined. TFO Bonney followed up with, "You don't have any weapons or anything on you?" to which Jimenez responded, "No." Following TFO Bonney's next request that Jimenez lift his jacket, Jimenez declined to do so. TFO Bonney then asked Jimenez a final time, "You don't have any weapons . . . ?" and Jimenez again responded that he did not.

Seconds later, TFO Bonney detained Jimenez and instructed him to go with the investigators to a more private space in the back of the bus station. Jimenez reached down to pick up his bags, but TFO Jaworski stopped him and said that he would get them for him. Jimenez stood back up and TFO Jaworski said, "I just don't want you reaching for stuff okay? I don't . . . want to see any weapons or nothing like that pop out," and simultaneously—without permission—started pulling Jimenez's blanket off him. After TFO Jaworski pulled the blanket nearly off Jimenez, TFO Bonney noticed a "deformity or an anomaly" on the front of Jimenez's waistline under his clothing and immediately brushed the back of his hand across it. He felt that it was hard, but otherwise did not know what it was. He speculated that it could have been a bomb. The investigators subsequently shuffled Jimenez into a room in the back of the bus station and handcuffed him. TFO Bonney noticed another similarly shaped bulge in the small of Jimenez's back, also concealed under his clothing. Following a series of questions, particularly about the bulges, Jimenez admitted to transporting narcotics. The investigators then searched Jimenez's person

and found more than 1,500 grams of methamphetamine concealed in a vest Jimenez was wearing under several layers of clothing.

Months later, a federal grand jury returned an indictment charging Jimenez with possession with intent to distribute 50 grams or more of methamphetamine. Jimenez pled not guilty and filed a motion to suppress the evidence on multiple grounds, including that the investigators lacked reasonable suspicion to detain and frisk him. According to Jimenez, all the evidence obtained following his unlawful detention was fruit of the poisonous tree[1] and should have been suppressed. After an evidentiary hearing, the magistrate judge issued a report recommending that the district court deny Jimenez's motion to suppress. Jimenez objected, but the district court overruled his objections and entered an order denying the motion to suppress.

Jimenez entered a conditional guilty plea, reserving his right to appeal the denial of his motion to suppress. On appeal, Jimenez has conceded that his first two encounters with TFO Bonney were consensual and that his third encounter involving both TFO Bonney and TFO Jaworski began consensually. He argues only that his detention and subsequent frisk during this third encounter were neither consensual nor supported by reasonable suspicion, and, thus, the evidence obtained thereafter must be suppressed as fruit of the poisonous tree. See United States v. Aquino, 674 F.3d 918, 923 (8th Cir. 2012) ("An encounter which is initially consensual . . . can become non-consensual . . . .").

II.

"We apply a mixed standard of review to a district court's denial of a motion to suppress evidence. We review factual findings for clear error, while we review *de novo* the ultimate conclusion of whether the Fourth Amendment was violated." United States v. Brown, 60 F.4th 1179, 1182 (8th Cir. 2023) (citation omitted).

---

[1]Wong Sun v. United States, 371 U.S. 471 (1963).

The Fourth Amendment guards against unreasonable searches and seizures. U.S. Const. amend. IV.  Law enforcement's decision to detain an individual for further investigation, commonly known as a Terry[2] stop, comports with the Fourth Amendment when officers have "a reasonable suspicion, supported by articulable facts, that criminal activity is afoot."  United States v. LaGrange, 981 F.3d 1119, 1121 (8th Cir. 2020).  In accordance with Terry, the Fourth Amendment also allows officers to conduct a protective frisk of the individual for weapons, but only if they have "reasonable suspicion that [the] person with whom [they are] dealing might be armed and presently dangerous."  United States v. Slater, 979 F.3d 626, 629 (8th Cir. 2020) (citation omitted); see also United States v. Moreno, 988 F.3d 1027, 1031 (8th Cir. 2021) ("Under an objective standard, the question is 'whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.'" (citation omitted)).

In either event:

Reasonable suspicion is determined by "look[ing] at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing [based upon his] own experience and specialized training to make inferences from and deductions about the cumulative information available."

United States v. Jones, 606 F.3d 964, 965-66 (8th Cir. 2010) (per curiam) (alterations in original) (citation omitted).  "We consider 'what the officer reasonably knew at the time' rather than assessing the existence of reasonable suspicion 'with the vision of hindsight.'"  Slater, 979 F.3d at 629 (citation omitted).

Here, there is no dispute that the TFOs conducted a Terry stop when TFO Bonney placed his hand on Jimenez's shoulder and instructed him to go with them to a private space in the back of the bus station.  The government relies on five circumstances to show that the TFOs had reasonable suspicion to detain Jimenez:

[2]Terry v. Ohio, 392 U.S. 1 (1968).

> (1) an inconsistent story about the origin of [Jimenez's] journey and who paid for his bus ticket; (2) the apparent lack of clothing for a trip Jimenez said could be a weeklong; (3) traveling from a "source state," (4) Jimenez's state of dress for the time of year and in comparison to other bus passengers; and (5) Jimenez's awkward removal of his backpack done in an effort to keep the blanket over his body.

Appellee Br. 15-16. The government then argues that TFO Jaworski's removal of Jimenez's blanket was reasonably necessary to protect the officers' safety and preserve the status quo. Finally, the government contends that after TFO Jaworski had almost completely removed Jimenez's blanket, and TFO Bonney observed a bulge in Jimenez's waistline, the officers then conducted a lawful pat down for weapons.

In making these arguments, the government points us to United States v. Moreno, 988 F.3d 1027 (8th Cir. 2021), where we upheld the frisk of a defendant who, like Jimenez, had arrived at the Trailways bus station in Omaha from Denver and was also wearing a blanket. There, after the bus arrived at the station, officers noticed a new suitcase on the curb, which lacked a personal luggage tag and had a phone number with identical, repeating digits. Id. at 1029-30. After Moreno claimed it, she demonstrably lied in telling the officers that she was traveling from Las Vegas to New York, while her ticket and destination tag showed that she was traveling from Denver to Chicago. Id. Throughout her consensual encounter with police, Moreno's hands were shaking. Id. The officers also noticed that, instead of checking her luggage to her final destination, Moreno had opted to reclaim and recheck the bag at every stop along the way. Id. While talking to the officers, Moreno's left arm appeared out of place, and she was holding the blanket together at her waist in an unnatural way. Id. When the officers asked Moreno if she would open the blanket, she voluntarily complied but turned away from them to do so. Id. After the officers asked her to face them and open her blanket, she willingly acquiesced, but bent forward at the waist. Id. At this point, without touching Moreno, one of the officers saw an obvious bulge at her side, which he believed to possibly be a weapon. Id. Yet, when asked about it, Moreno "repeatedly and emphatically denied" its existence

and tried to actively conceal it from the officers. Id. at 1032. Without permission, an officer reached under Moreno's blanket and touched the object, immediately determining that it was narcotics. Id. at 1030.

This Court upheld the frisk of Moreno under these circumstances. Id. at 1033. But Judge Grasz, in his concurring opinion, took pains to caution that it was a "unique case," not to be read expansively. Id. at 1033 (Grasz, J., concurring). And there are significant differences between the facts of this case and those in Moreno. First, while TFO Bonney noticed potential inconsistencies in Jimenez's story about his travel plans, the government conceded that Jimenez's story was "possible." Also unlike Moreno, Jimenez's ticket matched his story. Further, while Moreno's hands were shaking while talking to the officers, Jimenez never appeared nervous and maintained eye contact with TFO Bonney throughout all three of his conversations with him. Finally, and most notably, in Moreno, the officers saw an obvious bulge in Moreno's clothing while engaged in a consensual encounter with her. Even further, after they saw it, she repeatedly and emphatically denied its existence and tried to conceal it from the officers' view. Here, TFOs Bonney and Jaworski did not see a bulge on Jimenez until *after* detaining him—at which point the encounter was no longer consensual—and forcibly removing his blanket without permission.

Jimenez focuses on these crucial facts and uses them to argue that this case is instead controlled by United States v. Aquino, 674 F.3d 918 (8th Cir. 2012), where we held that an officer's raising an arrestee's pant leg without probable cause violated his Fourth Amendment rights. Id. at 927. There, like Jimenez, the defendant had arrived on a bus from Denver, and told the officers that he was traveling from California to Iowa. Id. at 920. The officers first noticed Aquino when he took a particular interest in, and became nervous after seeing, their encounters with other passengers. Id. at 921. Aquino eventually consented to a search of his bags, but he refused the officers' requests to search his person. Id. One of the officers requested that Aquino pull his clothing close to his body. Id. Aquino opened his jacket and pulled his shirt tightly to his body and did the same with his pants in the thigh area, but he did not do so on the lower portions of his legs. Id. He also

became very nervous and fidgety, and he was unable to maintain eye contact with the officers.  Id.  After another request, Aquino made only half-hearted attempts to pull his pant legs tight around his ankle area, and one of the officers noticed an unnatural bulge on the inside of Aquino's right calf.  Id.  Aquino refused to lift his pants above the bulge, so the officer arrested him and, without first conducting a pat down, immediately lifted Aquino's pant leg above the bulge and saw a duct-tape bundle strapped to his leg.  Id.

Here, Jimenez was not under arrest when the TFOs removed his blanket, and therefore, they were not required to meet the more demanding standard of probable cause.  But Aquino is still persuasive.  Indeed, there, we said that the officers could not lift Aquino's pant leg without first conducting a pat down, even *after* seeing a bulge on his leg.  Id.  While here, the officers did not even see a bulge on Jimenez until after they had pulled his blanket nearly off him.  However, we acknowledge that reaching under a defendant's clothing may be more intrusive than removing a defendant's blanket in certain circumstances.  Compare Moreno, 988 F.3d at 1033 ("[The officer] did not reach under Moreno's clothing—he briefly touched an area on top of her clothes, that was visible to him after Moreno had lifted the blanket."), with Aquino, 674 F.3d at 925 ("Searching under articles of clothing, whether it be a man's pant leg or a woman's blouse, is necessarily more intrusive than a pat down.").  While Aquino is not entirely on point then, we nonetheless find it closer to the mark than Moreno.  And like in Aquino, we ultimately hold that the TFOs violated the Fourth Amendment.

As to Jimenez's initial detention, we conclude that the TFOs had reasonable suspicion "that criminal activity [was] afoot" sufficient to detain him pending further investigation—but we caution that this standard was just barely satisfied.  LaGrange, 981 F.3d at 1121.  First, while Jimenez's story regarding his itinerary was possible, and no evidence proved that he was lying, as was the case in Moreno, there were still inconsistencies regarding who purchased his ticket and where his travel originated.  Second, Jimenez apparently traveled from California and Colorado— both "source states" for drugs—a fact which is entitled to some, even if little, weight

under our precedent.  See United States v. Beck, 140 F.3d 1129, 1137-38 (8th Cir. 1998) ("Because millions of law-abiding Americans reside in California and travel, mere residency in and travel from the State of California means the officer's 'source state' factor must be considered in this context. . . .  Clearly, the vast number of individuals coming from that state must relegate this factor to a relatively insignificant role.").

But we do not give much weight to TFO Bonney's observation that Jimenez's duffle bag contained minimal clothing, as Bonney knew that passengers often left luggage on the bus and did not ask Jimenez whether he had additional bags or clothing.  Further, while Jimenez was the only person wearing a blanket, it is not uncommon to travel with a blanket, and his dress was not unusual for the season given the date—September 24th—and that other passengers were wearing long sleeves, jackets, parkas, and even stocking caps.[3]  Compare Jones, 606 F.3d at 967 (per curiam) (concluding that wearing a hoodie in 68-degree weather in September was not so unusual as to contribute to suspicion), with United States v. Dortch, 868 F.3d 674, 680 (8th Cir. 2017) (concluding that wearing a heavy winter coat in June can contribute to reasonable suspicion).  Ultimately, what puts this case over the line is Jimenez's having awkwardly "shimmied" his backpack off from under his blanket to hand the backpack to TFO Bonney in a deliberate effort to keep the blanket on his person.  Under the totality of the circumstances, this fact combined with Jimenez's arrival from source states and the inconsistencies in his story regarding his travel plans gave the officers authority to detain him pending further investigation.

Even so, the TFOs went a step too far when they immediately removed Jimenez's blanket without first conducting a pat down.  Initially, it is questionable whether the TFOs would have even been justified in conducting a pat down, as the facts do not lend much credence to the claim that Jimenez may have been "armed

---

[3]Contrary to the dissent's suggestion, all but a few of the passengers at the bus station wore at least long sleeves.  We will concede to the dissent that several of the *plainclothes officers*, on the other hand—who prize flexibility and the necessity of immediate athletic maneuvering—wore short sleeves, some over bulky body armor.

-10-

and presently dangerous." Slater, 979 F.3d at 629 (citation omitted). Throughout the entire third encounter with TFO Bonney and TFO Jaworski, Jimenez's hands were clearly outside of his blanket on his phone. Further, unlike in Moreno, where the officers did not even touch Moreno until after seeing an obviously visible bulge, the existence of which Moreno repeatedly denied, here, the TFOs not only engaged in a more intrusive action by removing Jimenez's blanket, but they also did so before having any idea that there was even a bulge on Jimenez's waistline. Indeed, several of our cases have held that officers crossed the line in merely touching a suspect, even after seeing a bulge. See, e.g., United States v. Eustaquio, 198 F.3d 1068, 1071-72 (8th Cir. 1999); United States v. Tovar-Valdivia, 193 F.3d 1025, 1028 (8th Cir. 1999) ("The bulges could have been bandages . . ., a money belt . . ., or any number of non-contraband items."). Further, Jimenez was alone and six or seven other armed officers were in the immediate vicinity.

Even if we were to assume that the TFOs would have been justified in conducting a pat down of Jimenez based on his efforts to keep his blanket on his person and his potential involvement in drug trafficking, cf. United States v. Bustos-Torres, 396 F.3d 935, 943 (8th Cir. 2005) (highlighting relationship between drug transactions and weapons), the TFOs far exceeded the scope of these permissible bounds when they immediately leaped to the substantially more intrusive action of forcibly removing his blanket. See Terry, 392 U.S. at 25-26, 29 ("Even a limited search of the outer clothing for weapons constitutes a severe, though brief, intrusion upon cherished personal security," and, therefore, must be confined to that which is "reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer."); see also Aquino, 674 F.3d at 925 ("Searching under articles of clothing, whether it be a man's pant leg or a woman's blouse, is necessarily more intrusive than a pat down.").

As the TFOs' removal of Jimenez's blanket violated the Fourth Amendment, any evidence obtained therefrom is inadmissible. Eustaquio, 198 F.3d at 1071-72. Jimenez submitted to further questioning and a search of his person a few minutes later which led to the discovery of 1,500 grams of methamphetamine. However, the

taint of the TFOs' unconstitutional actions was not removed, and this evidence is thus "fruit of the poisonous tree" which must be suppressed. United States v. Villa-Gonzalez, 623 F.3d 526, 534 (8th Cir. 2010) (quoting Segura v. United States, 468 U.S. 796, 804 (1984)). We acknowledge that the TFOs were ultimately correct in their guess that Jimenez was carrying contraband, but their actions did not comply with the Fourth Amendment. The district court thus erred in denying the motion to suppress.

## III.

For the foregoing reasons, we reverse the district court's denial of the motion to suppress, vacate the conviction, and remand for proceedings consistent with this opinion.

STRAS, Circuit Judge, dissenting.

What was Sergio Jimenez hiding under his blanket? The officers had no clue. What they *did* know is that he repeatedly changed his story, made "unnatural" movements, and had a heavy blanket around his body when others wore short sleeves. *United States v. Moreno*, 988 F.3d 1027, 1030 (8th Cir. 2021). The common-sense conclusion was that he was "concealing something." The officers saw and heard enough to briefly detain Jimenez, according to the court, but not enough to remove the blanket and pat him down. *See ante*, at 9–10. In my view, the stop and frisk go together here, at least once the officers had reasonable suspicion. *See Terry v. Ohio*, 392 U.S. 1, 22, 27 (1968).

Reasonable suspicion is not a high bar. Once there are "articulable facts" that a suspect "may be armed and dangerous," the Fourth Amendment allows officers to conduct a stop and frisk for their own safety. *United States v. Flett*, 806 F.2d 823, 827–28 (8th Cir. 1986); *see United States v. Roggeman*, 279 F.3d 573, 578 (8th Cir. 2002) (explaining that this standard is "considerably less" than a "preponderance of the evidence" or "probable cause" (quoting *United States v. Sokolow*, 490 U.S. 1, 7

(1989))).  As we have concluded before, misleading officers about travel plans, making odd movements,[4] and wearing excessively bulky clothes are all articulably suspicious facts.  *See Moreno*, 988 F.3d at 1030; *see also United States v. Dortch*, 868 F.3d 674, 680 (8th Cir. 2017).  Just two years ago, we upheld a stop *and* frisk at this exact Omaha bus station under uncannily similar circumstances.  *See Moreno*, 988 F.3d at 1030–32.  Similar circumstances should lead to similar results.

But here they do not, at least in the court's view, because of the absence of a visible bulge to show he possessed something dangerous.  *See ante*, at 10–11; *Moreno*, 988 F.3d at 1030.  A bulge, however, has never been a hard-and-fast requirement for a frisk.  *See United States v. Hanlon*, 401 F.3d 926, 929–30 (8th Cir. 2005).  There is, after all, a reason we call them *concealed* weapons: they are not supposed to be openly visible.  Officers can still reasonably believe a suspect has one even if they cannot *see* exactly where it might be.  *See United States v. Bustos-Torres*, 396 F.3d 935, 943 (8th Cir. 2005) (explaining how evidence of a drug transaction can lead to an inference that a suspect is armed).  Happens all the time.  *See, e.g.*, *United States v. Gilliam*, 520 F.3d 844, 848 (8th Cir. 2008).

It is also a reach to say that *United States v. Aquino*, 674 F.3d 918 (8th Cir. 2012), calls for a different conclusion.  There, we held that officers lacked *probable cause* to reach *inside* a handcuffed suspect's pants to grab drugs taped to his leg.  *See id.* at 927.  As the court recognizes, removing a blanket from a suspect "completely clothed underneath" is a far cry from reaching under a suspect's clothes to find drugs—a full-blown search we said had to satisfy the stricter probable-cause

_____

[4]In addition to unnaturally "shimmy[ing]" while taking off his backpack, Jimenez twice reached toward his bags while talking with the officers.  After the first attempt, one officer told him, "I'll get your bags for you."  Only when Jimenez reached again, obscuring his hands in the process, did the officer start to lift the blanket.  As he told Jimenez, "I just don't want you reaching for stuff."  It makes sense that the officers would be concerned for their own safety in these circumstances.  *See United States v. Williams*, 39 F.4th 1034, 1042–43 (8th Cir. 2022).

standard.  *See ante*, at 9 (acknowledging that "reaching under a defendant's clothing may be more intrusive than removing a defendant's blanket").  Much more on-point is *Moreno*, a reasonable-suspicion case in which we permitted officers to reach *under* a blanket to pat down a suspect.  *See Moreno*, 988 F.3d at 1031–32.  I would come out the same way here.

———————————————