**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee*, v. JAMES ANTONIO BROWN, AKA James Anthony Brown, *Defendant-Appellant.* | No. 19-50250 D.C. No. 3:18-cr-00058-JLS OPINION |

Appeal from the United States District Court
for the Southern District of California
Janis L. Sammartino, District Judge, Presiding

Argued and Submitted July 10, 2020
Pasadena, California

Filed May 12, 2021

Before: Bobby R. Baldock,* Marsha S. Berzon, and
Daniel P. Collins, Circuit Judges.

Opinion by Judge Collins

---

* The Honorable Bobby R. Baldock, United States Circuit Judge for the U.S. Court of Appeals for the Tenth Circuit, sitting by designation.

**SUMMARY**[**]

# Criminal Law

The panel reversed the district court's denial of James Antonio Brown's motion to suppress the fruits of a search of his pocket and his subsequent conviction for possession of 35.35 grams of heroin with intent to distribute, and remanded.

Brown contended that his encounter with two police officers in a motel parking lot did not comply with the limitations set forth in *Terry v. Ohio*, 392 U.S. 1 (1968), and that the evidence the officers found on him should have been suppressed as fruits of a violation of his Fourth Amendment rights.

The panel held that the officers' encounter with Brown was consensual until the point at which an officer ordered Brown to stand up and turn around; at that point, the officer had seized Brown, but the seizure was justified because the officer had developed reasonable suspicion that Brown was engaged in a drug transaction.

The panel concluded, however, that, under *Sibron v. New York*, 392 U.S. 40 (1968), the officer's search of Brown's pocket exceeded the limited scope of what *Terry* permits because, in conducting the limited protective search for weapons that *Terry* authorizes, the officer did not perform any patdown or other initial limited intrusion but instead

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

proceeded directly to extract and examine an item in Brown's pocket.

## COUNSEL

Paul W. Blake (argued), Law Offices of Paul W. Blake, Escondido, California, for Defendant-Appellant.

Mark R. Rehe (argued), Assistant United States Attorney; Daniel E. Zipp, Chief, Appellate Section, Criminal Division; Robert S. Brewer, Jr., United States Attorney; United States Attorney's Office, San Diego, California; for Plaintiff-Appellee.

## OPINION

COLLINS, Circuit Judge:

In *Terry v. Ohio*, 392 U.S. 1 (1968), the Supreme Court held that if an officer has reasonable articulable suspicion that a person is engaged in a crime, the officer may briefly detain that person to make a limited and appropriate inquiry, *id*. at 21–22, and if the officer has reason to believe that the person detained may be armed with any sort of weapon, the officer may further conduct a limited protective frisk for such weapons, *id*. at 27–29. Appellant James Antonio Brown contends that his encounter with two police officers in a motel parking lot did not comply with *Terry*'s limitations in multiple respects, and that, as a result, the heroin and other evidence the officers found on him should have been suppressed as fruits of a violation of his Fourth Amendment rights. We conclude that the officers complied with *Terry* and its progeny in all respects except one: in

conducting the limited protective search for weapons that *Terry* authorizes, the officer here did not perform any patdown or other initial limited intrusion but instead proceeded directly to extract and examine an item in Brown's pocket. We conclude that, under *Sibron v. New York*, 392 U.S. 40 (1968)—a companion case to *Terry* that was decided the same day—the officer's search of Brown's pocket exceeded the limited scope of what *Terry* permits and was therefore unreasonable under the Fourth Amendment. We reverse the district court's denial of Brown's motion to suppress the fruits of that search and Brown's subsequent conviction based on that evidence.

# I

On the morning of November 15, 2017, El Cajon Police Department Officers Robert Wining and Robert Nasland responded to a radio call stating that motel staff at a downtown Econo Lodge Motel had reported two "transients" in the motel parking lot, one of whom was a white male who had a bike and who had been seen urinating in the bushes and the other of whom was a female.[1] The officers, who were in uniform, drove their patrol car over to the Econo Lodge and turned into the parking lot on the motel's south side. On the other side of the parking lot from

---

[1] On appeal from a conviction after the denial of a motion to suppress, we recount the evidence "in the light most favorable to the government." *United States v. Henry*, 615 F.2d 1223, 1230 (9th Cir. 1980). Where, as in this case, there was a trial after the suppression hearing, we may also rely on the testimony given at trial "to sustain the denial of a motion to suppress evidence, even if such testimony was not given at the suppression hearing." *United States v. Sanford*, 673 F.2d 1070, 1072 (9th Cir. 1982). Here, the trial testimony provides a few clarifying details, but it does not contain any materially different facts from the testimony presented at the suppression hearing.

the motel is a residential development, and the parking lot is separated from that development by a high concrete wall and an even taller wooden fence. Running along the wall is a slightly raised planter area, which in turn is supported by a relatively low retaining wall consisting of cinder blocks. When the officers arrived just past 11:00 AM, the parking lot was nearly empty, but there was a white U-Haul van parked, head-out, in one of the spaces farther down along the wall. As the officers entered the parking lot, they could not see anyone behind the U-Haul, but as they drove past the van, two men—later identified as James Brown and Jon Barlett—came into view seated on the low cinder block wall behind the van. The officers got out of their patrol car. Their body cameras were turned on and recorded the ensuing events.

Barlett is a white male who had a bike with him, so he fit the general description of one of the individuals provided in the radio call. Brown, however, did not meet the description of either of those individuals, because he is an African-American male and had no bicycle with him. Officer Wining testified that the two men look surprised to see the police, describing their reaction as a "deer-in-the-headlights look." Wining initiated a conversation, stating, "Howdy, guys," and asking, "What are we up to today?" Brown responded that he had come to "get some stuff out of the van," and Barlett stated that he was going to help Brown. Wining responded skeptically, telling Barlett "the motel called us because they saw you urinating back here in the bushes." Barlett responded, "they didn't see me," emphasizing the word "me." Wining then asked Barlett what his name was and, after he responded, Wining inquired if he had identification. While Barlett looked for his identification, Wining asked what room they were staying in, and Brown gave his room number. Wining then asked

Brown if he had identification. After Brown felt the outside of his pants pockets, he said that his wallet was inside the motel. Barlett mentioned that there were "some other folks back there" and pointed to an area farther back in the parking lot. Wining said to Barlett, "You're not staying here, are you, Jon?" Barlett responded that he was not.

Wining then asked the two men directly, "So, do we have a drug deal going on here, or what do we got going?" Barlett mumbled a response, and Brown said, "A drug deal? No, sir." Wining, who had 22 years of experience as a policeman, stated that "that's not uncommon in this area, so don't—you don't need to look at me so surprised." At Wining's request, Brown supplied his name, date of birth, height, and weight. For almost the next full minute, Wining wrote down information and communicated over his radio. Brown then spoke up, saying, "Didn't you say your call was for him urinating in the bushes; what does this got to do with me?" After Wining reiterated what the call was about, Brown said, referring to Barlett, "he just barely rode up." Wining said, "OK, there was somebody on a bike mentioned. Alright? So, we're here just to check it out." Wining asked Brown if the manager could verify that he was staying at the motel, and Brown said yes and explained that he was staying with another person there.

The officers radioed in the identifying information about the two men, which took over one minute. Wining then asked if either of the men had any warrants. Brown said no, but Barlett answered that he had "just cleared up some," having been released on bond from jail only two weeks ago. Pointing to the visible needle marks on Barlett's arms, Wining asked him whether he was using heroin. Barlett said, "not anymore," but he acknowledged that he "ha[d] a history of it." Shortly thereafter, Brown's cell phone went off, and

while still seated on the cinder block wall Brown engaged in a nearly minute-long casual conversation, laughing at one point at what the caller said. After the call ended, Wining asked Barlett where he had gotten his gold-colored watch. Barlett mumbled a response about Walmart, and Brown interjected, "you heard the old saying, everything that glitters ain't gold." Barlett said it was a "nice watch" and he "almost sold it for $40 the other day." Wining then inquired about a small Leatherman-brand multi-tool that was still in its bright-yellow packaging and that was sitting just next to Barlett on the top of the cinder block wall, between Barlett and Brown. Wining asked if Barlett was selling it to Brown, and Barlett said no and claimed that he just found the unopened package "under [a] bridge."

At this point, the encounter between the four men had lasted just over seven minutes. While asking about the multi-tool, Wining noticed that Brown "put his hands down to his sides" and that he then "reach[ed] his index finger into his right pocket." Wining walked over to Brown who raised his hands to his sides and said: "Oh, my bad, man, my bad." Wining ordered Brown to stand up and turn around. Wining explained, "I saw you reaching in that pocket," and when Brown denied that he had done so, Wining said, "Yeah, you were." Brown complied with Wining's instructions and allowed Wining to secure his arms behind his back in a finger hold. Pointing with his free hand to Brown's pants pocket, Wining asked, "What's in here?" Brown responded, "I'm not quite sure." Wining then stated "I'm going to check, OK?" Brown grunted a monosyllabic response that is unintelligible on the officers' body camera video. Wining then reached into Brown's pocket and pulled out a plastic bag. Brown claimed that it was coffee, but after inspecting it, Wining said "that is not coffee, James, that's heroin." Wining conducted a more thorough search of Brown, finding

several thousand dollars, a number of unused syringes, and suboxone strips used to treat opioid withdrawal.

The police subsequently obtained the motel's security camera footage from the hour immediately before Brown's and Barlett's encounter with the officers. It showed several people driving up to the vicinity of the U-Haul, briefly interacting with Brown, and then leaving.

Brown was charged with one felony count of possession of 35.35 grams of heroin with intent to distribute, in violation of 21 U.S.C. § 841(a)(1). Brown moved to suppress the items found during Wining's search, including the heroin and cash, on the basis that they were illegally obtained in violation of the Fourth Amendment. *See* Fed. R. Crim. P. 12(b)(3)(C). Brown argued, *inter alia*, that Wining had unlawfully seized Brown without adequate reasonable suspicion and that Wining's search of Brown's pocket was unreasonable because a "pat down for weapons does not allow further intrusion into a citizen's pockets." After an evidentiary hearing, the district court denied the motion, finding that Wining was credible and that his actions were "reasonable in light of the totality of the circumstances."

At trial, Brown testified that he never sold heroin to anyone and that he possessed the heroin that day only for his personal use. He testified that, at the time of his arrest, he was smoking at least three grams a day to alleviate the pain from injuries sustained in a car accident. The jury returned a guilty verdict and Brown was sentenced to 41 months in prison and three years of supervised release. Brown timely appealed, and we have jurisdiction under 28 U.S.C. § 1291.

## II

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Searches and seizures "conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well delineated exceptions." *Minnesota v. Dickerson*, 508 U.S. 366, 372 (1993) (simplified). One such exception is the so-called "*Terry* stop," which refers to a brief investigative detention as described in *Terry v. Ohio*, 392 U.S. 1 (1968). Under the authority recognized in *Terry*, a police officer who "'observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot'" may "briefly stop the suspicious person and make 'reasonable inquiries' aimed at confirming or dispelling his suspicions." *Dickerson*, 508 U.S. at 373 (quoting *Terry*, 392 U.S. at 30). In the event that, during the *Terry* stop, the officer justifiably believes that "'the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others,'" the officer "may conduct a patdown search" or frisk "'to determine whether the person is in fact carrying a weapon.'" *Id*. (quoting *Terry*, 392 U.S. at 24). "Each element, the stop and the frisk, must be analyzed separately; the reasonableness of each must be independently determined." *United States v. Thomas*, 863 F.2d 622, 628 (9th Cir. 1988).

On appeal, Brown contends both that he was unlawfully seized by Officer Wining without the requisite reasonable suspicion and that, even if Wining had authority to detain Brown under *Terry*, the search of Brown's pocket exceeded

the scope of a permissible protective frisk during an investigative detention. We consider these contentions in turn, reviewing the denial of the motion to suppress de novo and any associated factual findings for clear error. *United States v. Washington*, 490 F.3d 765, 769 (9th Cir. 2007).

## A

We conclude that the officers' encounter with Brown was consensual until the point at which Officer Wining ordered Brown to stand up and turn around. At that point, Wining had seized Brown, but the seizure was justified because, by that time, Wining had developed reasonable suspicion that Brown was engaged in a drug transaction with Barlett.

## 1

The Supreme Court has held that "a seizure does not occur simply because a police officer approaches an individual and asks a few questions." *Florida v. Bostick*, 501 U.S. 429, 434 (1991). "So long as a reasonable person would feel free to disregard the police and go about his business, the encounter is consensual and no reasonable suspicion is required." *Id.* (simplified). But once the officer, "by means of physical force or show of authority, has in some way restrained the liberty of a citizen," then a seizure has occurred and the requisite level of justification for the seizure must be shown. *Id.* If the consensual encounter has ripened into an investigatory detention under *Terry*, then the officer must have "'reasonable suspicion'—that is, 'a particularized and objective basis for suspecting the particular person stopped' of breaking the law." *Heien v. North Carolina*, 574 U.S. 54, 60 (2014) (citation omitted). But if the encounter has ripened into a full-blown arrest, then

it must be supported by probable cause.  *See United States v. Guzman-Padilla*, 573 F.3d 865, 876–77 (9th Cir. 2009).

A consensual encounter with a police officer ripens into a seizure when, under "all the circumstances surrounding the encounter," the "police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." *Bostick*, 501 U.S. at 439.  This "'reasonable person' test presupposes an *innocent* person."  *Id*. at 438.  Having reviewed the record evidence, including the videotape of the incident, we conclude that Wining's encounter with Brown and Barlett did not ripen into a seizure of Brown until the point at which Wining ordered Brown to stand up and turn around.

Several factors confirm that the officers' approach began as a consensual encounter.  The "encounter occurred in the middle of the day" and "in public view," *United States v. Crapser*, 472 F.3d 1141, 1146 (9th Cir. 2007), and it took place in an area where Brown was already seated when the police arrived and from which he showed no inclination to depart, *see Bostick*, 501 U.S. at 435–46 (in determining whether the encounter was consensual, court should consider that person approached by officer is in a place that he or she "has no desire to leave").  The officers' initial approach was casual and nonthreatening, opening with the greeting, "Howdy, guys," followed by an open-ended question about what they were doing.  Wining promptly disclosed that the officers were there to investigate the motel's report of public urination, and Wining accused Barlett of committing it. Brown correctly realized—and said aloud—that that report did not involve him.  Officer Wining stated his suspicion that the men were perhaps engaged in a drug deal, but both denied it, and Wining's questioning then shifted almost

entirely to Barlett—asking him about his needle marks and
heroin usage, his bond status, his gold-colored watch, and
his brand new Leatherman multi-tool.  Wining's questions
to Brown were generic, asking him about identification and
whether he was staying at the motel, and Wining never
suggested that Brown was not free to decline to answer or to
ignore the officer.  *INS v. Delgado*, 466 U.S. 210, 216 (1984)
(routine request for identification "does not, by itself,
constitute a Fourth Amendment seizure").  Indeed, during
the encounter Brown felt free to take a personal phone call,
during which he was chatting and laughing, for nearly a full
minute.  The officers also "made no effort to draw [Brown's]
attention to their weapons," and—at least initially—they did
not "use any form of physical force" or "affirmatively assert
authority over [his] movements."  *Crapser*, 472 F.3d at
1146; *cf. United States v. Washington*, 387 F.3d 1060, 1068–
69 (9th Cir. 2004) (finding a seizure where officers moved
the suspect "twenty to thirty feet away from his [apartment]
door," refused to close the suspect's door at the suspect's
request, and repeatedly warned the suspect that he could be
arrested).  Considering the totality of the circumstances, we
conclude that, up to the point at which Wining issued a
command to Brown to stand up and turn around, a
reasonable innocent person in Brown's situation would have
felt free to terminate the encounter.  *See Delgado*, 466 U.S.
at 216 (fact that "most citizens will respond to a police
request," and "do so without being told they are free not to
respond, hardly eliminates the consensual nature of the
response").

But the nature of the encounter changed once Wining
ordered Brown to stand up and turn around.  By giving this
order, Wining "affirmatively assert[ed] authority over
[Brown's] movements," *Crapser*, 472 F.3d at 1146, and at
that point Brown was seized for Fourth Amendment

purposes.  In distinguishing between a *Terry* stop and a full-blown arrest, we consider whether "a reasonable person would believe that he [or she] is being subjected to more than a temporary detention," *Guzman-Padilla*, 573 F.3d at 884 (simplified), as well as "the justification for the use of such tactics, *i.e.*, whether the officer had sufficient basis to fear for his safety to warrant the intrusiveness of the action taken," *United States v. Edwards*, 761 F.3d 977, 981 (9th Cir. 2014) (simplified).  Given that it was apparent, even to Brown, that the order was occasioned by the officers' perceived safety concerns arising from Brown's movement of his hand near his pocket, a reasonable person would have understood that the ensuing seizure was a temporary one that was justified by safety considerations.  Accordingly, this was a *Terry* seizure.  *See id*. at 981–82.

## 2

The only remaining question concerning the legality of this temporary seizure of Brown is whether Wining had the requisite reasonable suspicion to justify it.  In "discussing how reviewing courts should make reasonable-suspicion determinations," the Supreme Court has said "repeatedly that they must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citation omitted).  "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *Id*. (citation omitted).

As an initial matter, we reject the Government's suggestion that, as soon as the officers arrived at the motel, they already had reasonable suspicion that Brown was

engaged in a crime.   Upon arrival, the officers had
reasonable suspicion, based on the motel staff's report, that
*Barlett* may have committed public urination in violation of
California Penal Code § 370.  *See People v. McDonald*, 40
Cal. Rptr. 3d 422, 435 (Cal. Ct. App. 2006) ("public
urination falls within the type of conduct prohibited by
section 370").  But they did not have reason to believe that
*Brown* had done so, because, unlike Barlett, he did not fit the
description supplied by the motel.  And for similar reasons,
we reject the Government's suggestion that, upon arrival, the
officers already had reasonable suspicion that Brown was
*loitering* in violation of California Penal Code § 647(h).
That section defines loitering as "to delay or linger without
a lawful purpose for being on the property [of another] and
for the purpose of committing a crime as opportunity may be
discovered."    *Id*.    Upon arrival, the officers had no
articulable basis for concluding that Brown lacked a lawful
purpose to be on the property, much less that he was there
"for the purpose of committing a crime as opportunity may
be discovered."  Merely sitting next to a vehicle in a motel
parking lot does not, without more, give rise to reasonable
suspicion of loitering or any other crime.

But by the time that Brown was asked to stand up and
turn around—which is when the seizure commenced—the
officers had acquired additional information that gave rise to
reasonable suspicion that Barlett was there to purchase drugs
from Brown.  Barlett had visible needle marks on his arms
and admitted to having used heroin in the past.   His
explanation for why he had the unopened multi-tool—he had
found it "under [a] bridge"—strained credulity, and Wining
knew from his prior experience that heroin addicts may try
to barter items for drugs.  Wining also knew that drug deals
were not uncommon at motels in the area, and it was also
notable that Brown and Barlett were seated behind the van,

far into the parking lot, where they would be out of view of passing pedestrians and street traffic.  Wining had also noted their "deer-in-the-headlights" surprise when the patrol car unexpectedly pulled into the parking lot.  Giving appropriate regard for the "specific reasonable inferences which [an officer] is entitled to draw from the facts in light of his [or her] experience," *Terry*, 392 U.S. at 27; *see also Arvizu*, 534 U.S. at 273–74, we conclude that, at the point Wining ordered Brown to stand up, he had reasonable, articulable suspicion that Brown might be engaged in drug trafficking. The seizure of Brown was thus lawful.

## B

We turn, therefore, to whether Wining's search of Brown's pocket was consistent with the Fourth Amendment. We conclude that Wining had ample justification to conduct a protective frisk, but that the search of Brown's pocket exceeded the permissible scope of such a frisk.

## 1

In connection with an otherwise lawful investigative detention under *Terry*, "an officer may conduct a brief pat-down (or frisk) of an individual when the officer reasonably believes that 'the persons with whom he [or she] is dealing may be armed and presently dangerous.'"  *United States v. I.E.V.*, 705 F.3d 430, 434 (9th Cir. 2012) (quoting *Terry*, 392 U.S. at 30).  The test, again, is an objective one: "'whether a reasonably prudent [officer] in the circumstances would be warranted in the belief that his [or her] safety or that of others was in danger.'"  *Id*. at 435 (quoting *Terry*, 392 U.S. at 27).

Wining testified that he saw Brown "reach his index finger into his right pocket," and the district court did not

clearly err in crediting that testimony.[2]  We have recognized that "abrupt movements or . . . suspicious, furtive behavior" may "justifiably prompt[]" an officer "to fear for his [or her] safety," *Thomas*, 863 F.2d at 629, and even Brown, by immediately raising his hands and saying "Oh, my bad, man, my bad," recognized that the movement of his hands had reasonably given the officer some concern.  Moreover, we have already explained that Wining had reasonable suspicion that Brown was engaged in narcotics trafficking, *see supra* at 14–15, and we have recognized that where "officers reasonably suspected that [a person] was involved in narcotics activity, it was also reasonable for them to suspect that he [or she] might be armed."  *United States v. Davis*, 530 F.3d 1069, 1082–83 (9th Cir. 2008); *see also United States v. Flatter*, 456 F.3d 1154, 1158 (9th Cir. 2006).  Wining therefore had adequate justification to conduct a frisk of Brown.

**2**

Brown nonetheless contends that, even if Wining was authorized to conduct a protective frisk, his search of Brown's right pocket exceeded what *Terry* and its progeny allow.  We agree.

In describing the scope of the permissible protective frisk that is authorized during a brief investigative detention, *Terry* emphasized that the "sole justification" for such a search "is the protection of the police officer and others nearby," and any such search "must therefore be confined in scope to an intrusion reasonably designed to discover guns,

---

[2] The officers' body camera videos confirm that Brown's right hand was near his pocket, but given their angles of sight, neither video discloses what he was doing with his hand.

knives, clubs, or other hidden instruments for the assault of the police officer." 392 U.S. at 29. Thus, "unlike a search without a warrant incident to a lawful arrest," the limited protective intrusion permitted by *Terry* "is not justified by any need to prevent the disappearance or destruction of evidence of crime." *Id*. "If the protective search goes beyond what is necessary to determine if the suspect is armed, it is no longer valid under *Terry* and its fruits will be suppressed." *Dickerson*, 508 U.S. at 373. In *Terry* itself, the Court held that the officer there, after stopping three men based on reasonable suspicion that they were planning to commit a robbery, properly limited his protective search to "what was minimally necessary to learn whether the men were armed and to disarm them once he discovered the weapons." 392 U.S. at 30. Specifically, the officer "patted down the outer clothing" of the three men, and he "did not place his hands in their pockets or under the outer surface of their garments *until* he had felt weapons" in the clothing of two of the men, and "then he merely reached for and removed the guns" that he felt. *Id*. at 29–30 (emphasis added); *see also id*. at 7. As to the third man, the officer "never did invade [his] person beyond the outer surfaces of his clothes, since [the officer] discovered nothing in his pat-down which might have been a weapon." *Id*. at 30.

In a companion case to *Terry*, the Supreme Court addressed how these limits apply in the context of an officer who, as in this case, performed a protective *pocket search* rather than a patdown. *See Sibron*, 392 U.S. 40. In *Sibron*, the officer observed "Sibron talking to a number of known narcotics addicts over a period of eight hours," *id*. at 62, and the officer ultimately approached Sibron at a restaurant and "told him to come outside," *id*. at 45. Once outside, the officer said to Sibron, "You know what I am after." *Id*. Sibron reached into his pocket, and the officer then "thrust

his hand into the same pocket, discovering several glassine envelopes, which, it turned out, contained heroin." *Id*. The Court concluded that, with the meager information the officer had about Sibron, there were no reasonable grounds to suspect him of a crime. *Id*. at 62–63. And given that the officer had *not* claimed that he thought Sibron was reaching for a weapon, the Court also concluded that there was no justification for a protective search of Sibron for weapons. *Id*. at 64 & n.21.

But the Court also went on to hold that, "[e]ven assuming arguendo that there were adequate grounds to search Sibron for weapons, the nature and scope of the search conducted by [the officer] were so clearly unrelated to that justification as to render the heroin inadmissible." *Id*. at 65. As the Court explained, the "search for weapons approved in *Terry* consisted solely of a limited patting of the outer clothing of the suspect for concealed objects which might be used as instruments of assault," and it was only *after* feeling such weapons that the officer in *Terry* had "place[d] his hands in the pockets of the men he searched." *Id*. By contrast, the officer in *Sibron* made "no attempt at an initial limited exploration for arms," but simply "thrust his hand into Sibron's pocket and took from him envelopes of heroin." *Id*. As a result, the Court concluded, "[t]he search was not reasonably limited in scope to the accomplishment of the only goal which might conceivably have justified its inception—the protection of the officer by disarming a potentially dangerous man." *Id*. The search of Sibron's pocket therefore "violate[d] the guarantee of the Fourth Amendment, which protects the sanctity of the person against unreasonable intrusions on the part of all government agents." *Id*. at 65–66.

In *Dickerson*, the Supreme Court reaffirmed these limitations on the scope of a protective search during a *Terry* stop, stating that "[t]hese principles were settled 25 years ago when, on the same day, the Court announced its decisions in *Terry* and *Sibron*."  508 U.S. at 373.  The officer in *Dickerson* conducted a *Terry* stop and a patdown for weapons, and in doing so, he felt inside Dickerson's pocket a "small, hard object" that the officer recognized was *not* a weapon.  *Id*. at 377–78.  The Court acknowledged that, if it had been "immediately apparent" to the officer, from the patdown, that the object was narcotics, then probable cause would exist for a warrantless seizure of those narcotics.  *Id*. at 375–77.  But the Court noted that, on the facts of the case before it, the officer made that discovery "only after squeezing, sliding and otherwise manipulating the contents of [Dickerson's] pocket—a pocket which the officer already knew contained no weapon."  *Id*. at 378 (citation and internal quotation marks omitted).  The Court held that, by continuing to probe the feel of the item in Dickerson's pocket after having already determined that it was not a weapon, "the police officer in this case overstepped the bounds of the 'strictly circumscribed' search for weapons allowed under *Terry*."  *Id*. (quoting *Terry*, 392 U.S. at 26). The Court reiterated that the "sole justification" for such protective searches during *Terry* stops is to determine whether weapons are present, and by employing methods that went beyond that objective, the officer in *Dickerson* conducted "the sort of evidentiary search that *Terry* expressly refused to authorize."  *Id*.

Here, as in *Sibron* and *Dickerson*, the officer exceeded the bounds of the weapons search permitted by *Terry*.  That conclusion is compelled by *Sibron*, which in the relevant respects is on all fours with this case.  Here, as in *Sibron*, the police officer did not bother to conduct "an initial limited

exploration for arms," or any other less intrusive examination, but instead proceeded immediately to search the detainee's pocket.[3] *Sibron*, 392 U.S. at 65. And here, as in *Sibron*, there were no special factors that might have suggested the need for such immediate and more intrusive measures. In both cases, for example, the detainee was compliant, the officers were not outnumbered, and the encounter occurred in a public place. In such circumstances, *Sibron* expressly distinguished this sort of failure to undertake *any* less intrusive measure to accomplish the protective search from the "search for weapons approved in *Terry*," in which the officer first conducted a patdown and *only* reached into the pocket when the patdown revealed that weapons might be inside. 392 U.S. at 65. *Sibron* held that, by immediately proceeding to extract and examine contents from the detainee's pocket, the officer conducted a search that "was not reasonably limited in scope to the accomplishment of the only goal which might conceivably have justified its inception—the protection of the officer by disarming a potentially dangerous man." *Id*. The same is true here.

Although Brown relied on *Sibron* for this point in his opening brief, the Government failed even to mention the case in its answering brief. At argument, the Government suggested that *Sibron* is distinguishable because the Court noted that the officer in *Sibron* had not testified that he acted out of safety concerns. But this goes more to the Court's

---

[3] In this case, unlike in *Sibron*, the officer announced, "I'm going to check, OK?" before putting his fingers in Brown's pocket. The Government has not contended, either in the district court or in this court, that Wining's comment somehow means that Brown provided voluntary consent to the search. Any such contention has therefore been forfeited. *United States v. Johnson*, 812 F.3d 757, 762 n.1 (9th Cir. 2016).

alternative conclusion that the officer in *Sibron* lacked adequate cause to conduct a protective search in the first place, *id*. at 63–64, and it ignores the fact that the Court also proceeded to hold that, "[e]ven assuming *arguendo* that there were adequate grounds to search Sibron for weapons, the *nature and scope* of the search conducted by [the officer] were so clearly unrelated to that justification as to render the heroin inadmissible," *id*. at 65 (emphasis added). This alternative holding is not dicta, *see Woods v. Interstate Realty Co.*, 337 U.S. 535, 537 (1949) ("[W]here a decision rests on two or more grounds, none can be relegated to the category of *obiter dictum*."); *accord United States v. Bagdasarian*, 652 F.3d 1113, 1118 & n.16 (9th Cir. 2011), and that is especially true given *Dickerson*'s express reaffirmation that the relevant principles governing the scope of a protective search "were settled 25 years ago when, on the same day, the Court announced its decisions in *Terry* and *Sibron*." 508 U.S. at 373 (specifically citing this portion of *Sibron*, 392 U.S. at 65–66). *Sibron*'s holding that the "nature and scope" of the immediate pocket search were unreasonable confirms that the relevant inquiry is an *objective* one that focuses on whether the intrusion was "reasonably limited in scope to the accomplishment" of its protective purpose. 392 U.S. at 65. Here, the officer's immediate action in proceeding to remove and examine an item from Brown's pocket objectively exceeded what was necessary to verify that Brown did not have a weapon.

The Government notes that courts have not required that officers employ a patdown as the sole initial method of conducting a protective search under *Terry*. This observation provides no basis for evading *Sibron* here. The Government cites no case in which the Supreme Court or this court has ever upheld a pocket search as the *initial* means of conducting a protective search of a fully compliant detainee

during a *Terry* stop. Moreover, the cases that have upheld initial methods, other than a patdown, for conducting a protective search only serve to highlight the unreasonableness of the initial pocket search here.

For example, in *Adams v. Williams*, 407 U.S. 143 (1972), an officer conducted a *Terry* stop based on an informant's tip that a man sitting in a particular nearby vehicle at 2:15 AM in a high-crime area "had a gun at his waist" and was carrying drugs. *Id*. at 144–45. After the officer approached the car and asked the occupant to open the car door and to step outside, the occupant ignored that request and instead stayed in the car and rolled down the window. *Id.* at 145, 148. The officer immediately reached through the window and grabbed a loaded gun, which had not been visible from outside of the car, from the occupant's waistband, "precisely the place indicated by the informant." *Id*. at 145. The Court held that, "[u]nder these circumstances the policeman's action in reaching to the spot where the gun was thought to be hidden constituted a limited intrusion designed to insure his safety," "was reasonable," and was consistent with *Terry*. *Id*. at 148. *Adams* bears no resemblance to this case. It did not involve a pocket search as the initial means of intrusion; rather, it involved the immediate grabbing of a gun from the waistband of an uncooperative suspect in precisely the place where an informant had said it would be. Indeed, the Court in *Adams* specifically highlighted the fact that the suspect's refusal "to step out of the car so that his movements could more easily be seen" presented an "even greater threat" to the officer's safety that justified a more direct and focused protective intrusion. *Id*. Moreover, the encounter in *Adams* took place in middle-of-the-night circumstances that would reasonably be thought to present additional risks. *Id*. at 147. Nothing in *Adams* justifies the officer's decision in this case

to conduct an immediate pocket search of a fully compliant detainee in broad daylight in a public place.

The Government relies on our decision in *United States v. Hill*, 545 F.2d 1191 (9th Cir. 1976), but it too is inapposite. In *Hill*, police officers were investigating an armed robbery of a local bank. *Id*. at 1192. The report of the robbery indicated that the perpetrator, "lifting his shirt," had "displayed to the teller what appeared to be a gun." *Id.* Thus, as in *Adams*, the officers had specific information indicating that a gun would be in a particular place on a particular individual. An officer encountered Hill in the immediate vicinity of the robbery and intended to ask him whether he had seen the suspect "running through the area," but the officer "noticed a large bulge at [Hill's] waistband which he suspected of being caused by a weapon." *Id.* Without patting Hill down, the officer lifted Hill's untucked shirt and found not a gun, but the money Hill had stolen from the bank. *Id.* at 1192–93. In holding that the officer's actions "did not transcend the permissible bounds established by *Terry*," we emphasized that the officer had not conducted a "general exploratory search[]," but only a "direct and specific inquiry" that corresponded to the report of a gun in the suspect's waistband under his shirt. *Id*. at 1193. Notably, we distinguished *Sibron* on the grounds that it "involve[d] pocket searches," and we also noted that in *Sibron* there was no justification for a protective search in the first place. *Id. Hill*, like *Adams*, confirms that in some circumstances, the initial method for conducting a protective search during a *Terry* stop need *not* be a *patdown*. *See United States v. Baker*, 78 F.3d 135, 136, 138 (4th Cir. 1996) (officer's order that suspect lift his shirt, thereby revealing a gun, was justified by *Terry* after officer noticed a bulge under the suspect's shirt). But neither case supports the quite

different proposition that the initial method may be a *pocket search* of a fully compliant detainee.

The Government nonetheless seizes on *Hill*'s comment that, "[a]ny limited intrusion designed to discover guns, knives, clubs or other instruments of assault are [*sic*] permissible" during a *Terry* protective search, *id*. at 1193, and it therefore argues that immediate pocket searches are *always* allowed during *Terry* stops.  The Government errs in overreading this comment, which says nothing more than that a properly "limited" intrusion is permissible.  We know from *Sibron* that the intrusion in this case was *not* "limited" in the manner that *Terry* and *Sibron* require.  Moreover, the Government's overreading of this remark is impossible to square with the Court's holding in *Dickerson*.  There, as we have explained, the Court held that a *patdown of a pocket* exceeded in length and intrusiveness what was necessary to verify that the suspect did not have a weapon.  508 U.S. at 378–79.  According to the Government's view, however, the primary error that the officer in *Dickerson* made was apparently not to exercise his supposed authority to immediately *start* with a direct pocket search.  Such a view would eviscerate both *Dickerson* and *Sibron*, and so it cannot be correct.  Indeed, the Government's position that officers can always choose to begin with pocket searches would erase the critical distinction that *Dickerson* underscored between a limited intrusion to detect weapons and a general search "'to discover evidence of crime.'"  *Id*. at 373 (citation omitted).

The Government also claims that this court "has already specifically approved pocket searches as reasonable protective searches," citing *United States v. Thompson*, 597 F.2d 187 (9th Cir. 1979), and *United States v. Hoffman*, 762 F. App'x 397 (9th Cir. 2019).    These cases are

distinguishable in a way that proves the Government's error. In both cases, the officer only performed a pocket search *after* initially performing a less intrusive patdown that was *inconclusive*. *See Thompson*, 597 F.2d at 191 (holding that pocket search was "justified" because of the officer's "inability to determine from a pat-down whether the pocket of the bulky coat contained a weapon"); *Hoffman*, 762 F. App'x at 399–400 (holding that officer was justified in removing objects from Hoffman's pocket that, based on his initial patdown, "he had *not yet* ruled out as a weapon"). Nothing in these cases supports what the Government asserts here, which is a right directly to proceed to a pocket search as the *initial* method of conducting a protective search of a fully cooperative detainee during a *Terry* stop.

Finally, the Government relies on the Fifth Circuit's decision in *United States v. Reyes*, 349 F.3d 219 (5th Cir. 2003), which concluded that an officer's order to the detainee to empty his pockets and lift his shirt was a reasonable protective search under *Terry*. *Id*. at 225. However, the Government overlooks the fact that *Reyes* does not indicate that anything was found in Reyes's pockets and that the opinion instead describes his motion to suppress as directed only to the discovery of a taped package of drugs when he was asked to lift his shirt. *Id*. at 222, 225. Although the Fifth Circuit also suggested that the order to empty the pockets was reasonable, *id*. at 225, that observation was dicta and is inconsistent with *Sibron* and *Dickerson*.

Given that Brown was fully compliant and there were no special circumstances indicating a need for more immediately intrusive measures, the officer's direct search of Brown's pocket "was not reasonably limited in scope to the accomplishment of the only goal which might conceivably have justified its inception—the protection of

the officer by disarming a potentially dangerous man."
*Sibron*, 392 U.S. at 65; *see also United States v. Casado*, 303
F.3d 440, 448–49 (2d Cir. 2002) (where "[t]he less intrusive
alternative of a frisk was obvious, commonly employed, and
would have been effective" to ensure officer safety, a pocket
search was unreasonable); *United States v. Aquino*, 674 F.3d
918, 925–26 (8th Cir. 2012) (searching underneath
handcuffed suspect's pant leg was unreasonable because
"[s]earching under articles of clothing . . . is necessarily
more intrusive than a pat down").  And the Government has
pointed us to nothing else concerning the traditional
understanding of the Fourth Amendment's protections that
would justify the pocket search conducted here.  *Cf.*
*Dickerson*, 508 U.S. at 381–82 (Scalia, J., concurring)
(discussing the extent to which the limited frisk authority
recognized in *Terry* is consistent with original meaning).
Because the scope of the search in this case exceeded
*Sibron*'s limits, that search was "no longer valid under *Terry*
and its fruits [must] be suppressed."  *Id.* at 373 (citing
*Sibron*, 392 U.S. at 65–66).  The district court therefore erred
in denying Brown's motion to suppress.[4]

### REVERSED and REMANDED.

---

[4] We reject, however, Brown's contention that the evidence at trial
was insufficient to sustain a conviction, thereby barring on that basis any
possibility of a retrial.  *See United States v. Lewis*, 787 F.2d 1318, 1323
(9th Cir. 1986) ("Even though we reverse that conviction, we must
address the sufficiency of the evidence supporting it, for if the evidence
were insufficient, retrial is barred by the Double Jeopardy Clause.").
Especially given the motel surveillance video showing various persons
briefly interacting with Brown over the hour preceding his encounter
with the officers, a rational jury could reasonably conclude that he was
distributing heroin in the motel parking lot.