**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 20-50314 |
| *Plaintiff-Appellee,* | D.C. No. 2:18-cr-00779-PA-2 |
| v. | |
| TERRANCE DOUGLAS BAKER, | OPINION |
| *Defendant-Appellant.* | |

Appeal from the United States District Court
for the Central District of California
Percy Anderson, District Judge, Presiding

Argued and Submitted October 4, 2022
Pasadena, California

Filed January 30, 2023

Before: Danielle J. Forrest and Gabriel P. Sanchez, Circuit
Judges, and Nancy D. Freudenthal,* District Judge.

Opinion by Judge Sanchez

---

* The Honorable Nancy D. Freudenthal, United States District Judge for
the District of Wyoming, sitting by designation.

## SUMMARY[**]

### Criminal Law

The panel affirmed Terrance Baker's convictions for Hobbs Act robbery and conspiracy to commit robbery in violation of 18 U.S.C. § 1951(a) and a sentence enhancement under U.S.S.G. § 3C1.1, reversed his conviction for brandishing a firearm in violation of 18 U.S.C. § 924(c)(1)(A)(ii), and remanded for a reduction of sentence or retrial on the § 924(c) count.

One week after an armed robbery of a Sprint store, Baker was stopped and frisked by the Los Angeles Police Department. Although no weapons or contraband were found on Baker, an officer removed a car key from his belt loop without his consent and walked to a nearby parking lot in search of the car associated with the key. Baker denied having a car. When officers located a red Buick whose flashing headlights responded to the key fob, Baker fled and was apprehended a short distance away. A handgun was recovered from the car and later introduced at Baker's trial as the weapon used in the Sprint store robbery.

Baker contended that the evidence of the handgun resulted from an illegal search and seizure and should have been suppressed at trial. The panel held that even if officers had reasonable grounds to stop Baker, the search and seizure exceeded constitutional limits. The panel noted that the Government is unable to explain how the officers' post-patdown detention and search for the car was intended to

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

confirm or dispel their suspicions about a crime being committed or to secure the safety of anyone on the scene. The panel explained that had officers limited their *Terry* stop to a brief detention and protective patdown search of Baker, they would have had no occasion to search for a car in an adjoining parking lot that matched the key fob hanging from Baker's belt loop. The Government argued that by stating he did not have a car, Baker abandoned the car key, eliminating his possessory interest in it and leaving him without standing to challenge its seizure or the resulting search of the car. Based on the totality of the circumstances, the panel concluded that Baker did not objectively demonstrate his intent to abandon the car key. The panel concluded that the discovery of the handgun was the product of illegal police conduct, whether that conduct is framed as exceeding the permissible scope of a *Terry* stop or as the warrantless seizure of the car key.

The panel wrote that the exclusionary rule required suppression of the handgun evidence at Baker's trial unless an exception to the rule applies. The Government argued that the attenuation doctrine applies based on Baker's flight from officers. Rejecting this argument, the panel noted that where this court has found flight to satisfy the attenuation doctrine, the circumstances of that flight have provided independent grounds for discovering the challenged evidence such that the officer's prior illegal conduct was not the sole reason for the discovery of the evidence. The panel explained that here the officers' illegal seizure of the key was the sole reason for the discovery of the car—Baker's flight played no role in the identification of the red Buick or its eventual search, and therefore could not purge the taint of the illegal conduct.

The panel concluded that the Government demonstrated beyond a reasonable doubt that the jury would have convicted Baker of robbery and conspiracy to commit robbery in violation of § 1951(a) based on substantial independent evidence establishing Baker's involvement in the robbery. The panel concluded that there is, however, reasonable doubt whether the jury would have convicted Baker of brandishing a firearm in violation of § 924(c) absent the admission of the handgun. The panel therefore vacated Baker's conviction on the § 924(c) count.

The panel held that because the jury was adequately informed of the limitations of cell site location information, the district court's decision to admit the testimony of the Government's cell data mapping expert was not erroneous under any standard of review. The panel held that the district court did not abuse its discretion in denying admission of a report by the Department of Commerce's National Institute of Standards and Technology (NIST) on guidelines for mobile device forensics. Because none of the report's stated purposes describes the activities of the NIST, the panel rejected Baker's argument that public records exception to the hearsay rule applies.

Baker contended that the trial testimony of Baker's co-defendant was insufficient to support the factual finding that Baker threatened the co-defendant, and that the district court therefore erred in applying an obstruction of justice sentencing enhancement under § 3C1.1. Rejecting this contention, the panel held that the district court's determination that Baker committed obstructive conduct was not clearly erroneous.

**COUNSEL**

Gail Ivens (argued), Gail Ivens Attorney at Law, Monterey, California, for Defendant-Appellant.

Bram M. Alden (argued), Assistant United States Attorney, Criminal Appeals Section Chief; Tracy L. Wilkison, United States Attorney; Joseph D. Axelrad; Jeffrey M. Chemerinsky, Department of Justice Office of the United States Attorney, Los Angeles, California; Charles E. Fowler Jr., Department of Justice United States Attorney's Office, Austin, Texas; Plaintiff-Appellee.

**OPINION**

SANCHEZ, Circuit Judge:

One week after an armed robbery of a Sprint store in Los Angeles, Terrance Baker was stopped and frisked by the Los Angeles Police Department (LAPD). Although no weapons or contraband were found on Baker, an officer removed a car key from his belt loop without his consent and walked to a nearby parking lot in search of the car associated with the key. Baker denied having a car. When officers located a red Buick whose flashing headlights responded to the key fob, Baker fled and was apprehended a short distance away. A handgun was recovered from the car and later introduced at Baker's trial as the weapon used in the Sprint store robbery. Baker was convicted of Hobbs Act robbery and conspiracy to commit robbery in violation of 18 U.S.C. § 1951(a), and brandishing a firearm in violation of 18 U.S.C. § 924(c)(1)(A)(ii).

This appeal presents two principal questions: whether officers violated Baker's Fourth Amendment right to be free from unreasonable searches and seizures by exceeding the scope of their patdown search and seizing the car key, and, if a constitutional violation occurred, whether the handgun evidence was nevertheless admissible because Baker's flight from officers attenuated the discovery of the handgun. We conclude that the handgun evidence was illegally obtained and should have been excluded at trial, and that this error prejudiced Baker as to the brandishing conviction but was harmless as to the convictions for Hobbs Act robbery and conspiracy. We reject Baker's claims of error concerning the district court's evidentiary rulings at trial and its imposition of an obstruction of justice sentencing enhancement. Accordingly, we affirm in part, reverse in part, and remand for further proceedings.

## I.

One week after the robbery of a Sprint store in Los Angeles, LAPD Officers Byun and Salas observed a group of individuals congregating at the Nickerson Gardens housing complex. Baker stood among them in front of the complex. According to Officer Byun, officers were aware that Baker was a gang member who did not reside at Nickerson Gardens and Officer Byun suspected that Baker was trespassing.

As the officers approached Baker, he lifted his shirt to demonstrate he was unarmed. Officer Byun conducted a patdown search of Baker that revealed no weapons or contraband. Officer Byun then observed a car key attached to Baker's belt loop, which Officer Byun removed. He directed Baker to hand over his driver's license. Officer Byun walked away with the car key and Baker's driver's

license to an adjacent parking lot, where he paused at various parked cars to identify which car matched the key. Officer Salas directed Baker to walk toward the parking lot, then commanded him to stop and put his hands behind his back as Officer Byun continued his search for the car. Officer Salas asked Baker if he had driven a car to the location, and Baker responded "I don't have a car."

When Officer Byun pressed the car lock on the key, he observed flashing headlights from a red Buick parked on the street. "You don't have a car? That's your car right there, it's blinking, man," Officer Byun said to Baker. Officer Byun signaled to Officer Salas to handcuff Baker. Baker took off running. After a brief foot chase during which Officer Byun lost the car key, Baker was apprehended a short distance away. He told police the car belonged to his mother and that "he had run because he was scared."

While Baker was in custody, additional officers arrived to investigate the red Buick identified by Officer Byun. LAPD Officer Ceballos testified at trial that when he peered inside the car, he "was able to see underneath the front seat what appeared to be the butt of a handgun." Another officer used a baton to open the car door, setting off the car alarm, and officers recovered a handgun with a black frame and silver slide. The gun was admitted at trial along with surveillance video of the robbery. Government expert witnesses testified that the gun recovered from the red Buick was a real firearm and that its distinctive black-and-silver color scheme matched the gun used by the robber in the surveillance video.

At trial, the prosecution also introduced testimony by Baker's co-defendant Walter Collin Beatty, who described in detail how he and Baker planned and committed the

robbery of the Sprint store where Beatty worked. Another store employee testified that a handgun was pointed at his head and he was forced on the ground and held in the back room while Beatty took iPhones from the Sprint safe. The jury was shown Facebook photos of Baker in clothing appearing to match the clothing worn by the robber in the surveillance video of the robbery. Cell phone evidence introduced against Baker included toll records showing seven calls between Baker and Beatty on the evening of the robbery, as well as cell site location information ("CSLI") admitted to show Baker's movement toward the Sprint store before the robbery and away from the store afterward.

The district court denied Baker's motions to suppress the evidence of the handgun and to exclude the testimony of Jeffrey Bennett, the Government's cell data mapping expert. The district court also sustained the Government's objection to the introduction of a 2014 publication by the United States Department of Commerce, which defense counsel sought to introduce during Bennett's cross-examination.

The jury found Baker guilty of the three counts arising from the Sprint store robbery. Based on Beatty's testimony that Baker had threatened him prior to Beatty's trial testimony, the district court applied an obstruction of justice sentencing enhancement. Baker was sentenced to 125 months on each of the two Hobbs Act counts, to be served concurrently, and a consecutive 84-month term for the § 924(c) count. He timely appealed.

## II.

Baker contends that the evidence of the handgun resulted from an illegal search and seizure and should have been suppressed at trial. We review the denial of a motion to suppress *de novo* and the district court's underlying factual

findings for clear error, including the finding that property has been abandoned for purposes of the Fourth Amendment. *United States v. Magdirila*, 962 F.3d 1152, 1156 (9th Cir. 2020); *United States v. Stephens*, 206 F.3d 914, 916–17 (9th Cir. 2000).

## A.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.  A "search" involves governmental infringement on "an expectation of privacy that society is prepared to consider reasonable," while a "seizure" of property involves "some meaningful interference [by the government] with an individual's possessory interests in that property." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)*.*  Fourth Amendment rights are personal rights that "may not be vicariously asserted." *Alderman v. United States*, 394 U.S. 165, 174 (1969).  To establish standing to challenge governmental intrusions under the Fourth Amendment, an individual must demonstrate their reasonable expectation of privacy in a place searched, or meaningful interference with their possessory interest in property seized.  *See United States v. Singleton*, 987 F.2d 1444, 1447 (9th Cir. 1993) (citing *United States v. Salvucci*, 448 U.S. 83, 95 (1980)); *Lavan v. City of Los Angeles*, 693 F.3d 1022, 1027–29 (9th Cir. 2012).[1]  "Because warrantless searches or seizures of abandoned property do not violate the

---

[1] The question of who may challenge a given instance of conduct under the Fourth Amendment has been described both as a question of "standing" and as "within the purview of substantive Fourth Amendment law." *See United States v. $40,955.00 in U.S. Currency*, 554 F.3d 752, 756 (9th Cir. 2009) (quoting *Rakas v. Illinois*, 439 U.S. 128, 140 (1978)).

[F]ourth [A]mendment, persons who voluntarily abandon property lack standing to complain of its search or seizure." *United States v. Nordling*, 804 F.2d 1466, 1469 (9th Cir. 1986).

We begin with the bedrock principle that warrantless searches and seizures "are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well delineated exceptions." *Minnesota v. Dickerson*, 508 U.S. 366, 372 (1993) (quoting *Thompson v. Louisiana*, 469 U.S. 17, 19–20 (1984)). One of these exceptions is the *Terry* stop, which permits an officer with reasonable suspicion that an individual is engaged in a crime to briefly detain the individual and make "'reasonable inquiries' aimed at confirming or dispelling [the officer's] suspicions." *Dickerson*, 508 U.S. at 373 (quoting *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). If the officer has reasonable suspicion that the detained individual is "armed and presently dangerous," the officer may conduct a frisk, a protective patdown search of the individual for weapons. *Terry*, 392 U.S. at 30.

The Government contends that the stop-and-frisk was lawful because it was supported by the officers' reasonable suspicion that Baker was trespassing in front of the Nickerson Gardens housing complex. Baker disputes that the officers had reasonable grounds to initiate a stop-and-frisk and argues that he was effectively arrested without probable cause. We need not resolve this dispute because even if officers had reasonable grounds to stop Baker, the search and seizure conducted in this case exceeded constitutional limits.

A *Terry* stop must be "confined in scope" to a "carefully limited search of the outer clothing … in an attempt to

discover weapons." *Id.* at 29, 30. If weapons are discovered, they "may properly be introduced in evidence against the person from whom they were taken." *Id.* at 31. Police officers may also seize "nonthreatening contraband detected during a protective patdown search … so long as the officers' search stays within the bounds marked by *Terry*." *Dickerson*, 508 U.S. at 373. As the Government acknowledges, Baker has standing to challenge the legality of the *Terry* stop-and-frisk initiated against him, including whether officers exceeded the permissible scope of the stop. It is well established that a *Terry* stop is a seizure of an individual and a frisk is a search of the individual's person within the meaning of the Fourth Amendment. *See Terry*, 392 U.S. at 16–20. Assuming officers reasonably suspected that Baker was trespassing and armed, they were authorized to briefly detain him to ask questions related to trespassing and to pat him down for weapons. But after officers confirmed that Baker did not possess weapons or contraband, they turned to other purposes. Officer Byun removed a key visibly hanging from Baker's belt loop and searched for a car that corresponded to it. Officers continued to detain Baker, not for the purpose of inquiring about trespass, but to ask him questions about whether he owned a car. Officer Byun made no claim that he suspected the car key was a weapon or contraband. *See Dickerson*, 508 U.S. at 377–78.

The Government is unable to explain how the officers' post-patdown detention and search for the car was intended to confirm or dispel their suspicions about a crime being committed or to secure the safety of anyone on the scene. Baker has shown that the handgun was discovered as a result of police conduct that violated his Fourth Amendment rights. *Id.* at 373; *Terry*, 392 U.S. at 30–31. Had officers limited

their *Terry* stop to a brief detention and protective patdown search of Baker, they would have had no occasion to search for a car in an adjoining parking lot that matched the key fob hanging from Baker's belt loop.

Our holding in *United States v. Brown*, 996 F.3d 998 (9th Cir. 2021), is instructive. We considered whether an officer conducting a *Terry* stop could lawfully reach into the detainee's pocket as the initial means of conducting a patdown search. *Id.* at 1009. Noting that the Government cited no case from the Supreme Court upholding such a search, we held that even if the officer "was authorized to conduct a protective frisk, his search of [the defendant's] right pocket exceeded what *Terry* and its progeny allow." *Id.* at 1008. Here, the Government has similarly failed to identify any caselaw showing that the removal of a key from a defendant's belt loop qualifies as part of a lawful *Terry* frisk. Where a "protective search goes beyond what is necessary to determine if the suspect is armed, it is no longer valid under *Terry* and its fruits will be suppressed." *Dickerson*, 508 U.S. at 373 (citing *Sibron v. New York*, 392 U.S. 40, 65–66 (1968)).

The Government conceded at oral argument that the officers should not have seized the key from Baker during the *Terry* stop. However, the Government argues that by stating he did not have a car, Baker abandoned the car key, eliminating his possessory interest in it and leaving him without standing to challenge its seizure or the resulting search of the car.[2] *See Nordling*, 804 F.2d at 1469. The

---

[2] In addition to advising police that the red Buick belonged to his mother, Baker did not assert a possessory or ownership interest in the car after his arrest or in his suppression motion. The Government speculates that

district court accepted the premise that Baker lacked standing to challenge seizure of the key "because of his statements that he did not have a possessory or any interest in the car prior to the seizure."

The Government's standing argument fails to persuade because Baker's statements concerning the car did not constitute abandonment of a possessory interest in the key hanging from his belt.  Because abandonment is "a question of intent," we must consider the totality of the circumstances to determine whether an individual, by their words, actions, or other objective circumstances, so relinquished their interest in the property that they no longer retain a reasonable expectation of privacy in it at the time of its search or seizure. *Id.*; *Lavan*, 693 F.3d at 1027–28.  Our caselaw recognizes two important factors in this inquiry: the denial of ownership and the physical relinquishment of the property.  *Nordling*, 804 F.2d at 1469; *see also United States v. Lopez-Cruz*, 730 F.3d 803, 809 (9th Cir. 2013) ("[N]one of our 'abandonment' cases has held that mere disavowal of ownership, without more, constitutes abandonment of a person's reasonable expectation of privacy in that property.").

Based on the totality of the circumstances, we conclude that Baker did not objectively demonstrate his intent to abandon the car key.  Baker never disclaimed any ownership or possessory interest in the key itself, nor did he voluntarily

---

Baker "could have taken the car and its key without his mother's permission, in which case he would not have standing to object to the seizure of the key," but no evidence in the record supports this conjecture.

relinquish possession or control over the key.[3]   Instead, Officer Byun removed the key from Baker's belt loop without his consent.  That the key was hanging from Baker's belt manifests an objective intent to maintain possession of it.  According to the Government, Baker's assertion that he had no car operated to deny any ownership interest in the car key.  The Government identifies no precedent in support of the proposition that a person abandons an item in his possession by stating he does not own a different, related item.  Even if such a claim had a basis in law, an individual does not relinquish a possessory interest in an item merely by stating he does not own the item.  *See Lopez-Cruz*, 730 F.3d at 808–09 (concluding the defendant did not abandon cell phones in his possession when he told police the phones belonged to a friend because the defendant "did not disclaim use of them or otherwise disassociate himself from them").  No evidence in the record suggests that Baker disassociated himself from the car key even if the key belonged to someone else.

The discovery of the handgun was the product of illegal police conduct, whether that conduct is framed as exceeding the permissible scope of a *Terry* stop or as the warrantless seizure of the car key.  Where evidence is obtained from an unlawful search or seizure, the exclusionary rule renders inadmissible both "primary evidence obtained as a direct result of an illegal search or seizure" and "evidence later

---

[3] These circumstances differ from examples in which abandonment was found where the defendant discarded property in a hotel wastebin before checking out, *Abel v. United States*, 362 U.S. 217, 241 (1960), threw property out of a moving vehicle, *United States v. McLaughlin*, 525 F.2d 517, 519–20 (9th Cir. 1975), released control over it to a third party, *United States v. Mendia*, 731 F.2d 1412, 1414 (9th Cir. 1984), or deliberately left it on an airplane, *Nordling*, 804 F.2d at 1469–70.

discovered and found to be derivative of an illegality," known as "fruit of the poisonous tree." *Utah v. Strieff*, 579 U.S. 232, 237 (2016) (quoting *Segura v. United States*, 468 U.S. 796, 804 (1984)); *Wong Sun v. United States*, 371 U.S. 471, 488 (1963). The exclusionary rule required suppression of the handgun evidence at Baker's trial unless an exception to the rule applies. *Strieff*, 579 U.S. at 237–38. We address next the Government's contention that the handgun evidence was admissible under the attenuation doctrine based on Baker's flight from officers.

## B.

The Supreme Court has adopted several exceptions to the exclusionary rule, observing that the "significant costs" of excluding evidence from a criminal trial "have led us to deem it applicable only where its deterrence benefits outweigh its substantial social costs." *Id.* at 237 (quoting *Hudson v. Michigan*, 547 U.S. 586, 591 (2006)) (internal quotation marks and ellipsis omitted). The exception relevant to this case is the attenuation doctrine. *Id.* at 238.

Under the attenuation doctrine, "[e]vidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that 'the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.'" *Id.* (quoting *Hudson*, 547 U.S. at 593). Courts determining whether attenuation applies consider the three factors set forth in *Brown v. Illinois*, 422 U.S. 590, 603–04 (1975): first, the "temporal proximity" between the conduct and the discovery of the evidence; second, the "presence of intervening circumstances"; and third, "the purpose and

flagrancy of the official misconduct." The Government bears the burden of demonstrating admissibility. *Id.* at 604.

In *Utah v. Strieff*, for example, an officer unlawfully stopped the defendant and discovered during the detention that the defendant had an outstanding arrest warrant. 579 U.S. at 235, 240. The officer arrested the defendant and conducted a search incident to arrest that led to the discovery of drug-related evidence, the admission of which the defendant challenged. *Id.* at 235–36. Applying the *Brown* factors, the Court held that the discovery of the evidence "only minutes after the illegal stop" favored suppression. *Id.* at 239–40. However, the valid arrest warrant—one that predated and was "entirely unconnected" to the illegal stop—constituted an intervening circumstance that favored a finding of attenuation. *Id.* at 240. The Court reasoned that the arrest warrant obligated the officer to arrest the defendant and the arrest itself established the officer's authority to search the defendant's person. *Id.* at 240–41. As to the third factor, the officer's decision to initiate the stop rested on "good-faith mistakes" rather than a purposeful or flagrant disregard for the law. *Id.* at 241. The Court thus deemed the drug-related evidence admissible because "the unlawful stop was sufficiently attenuated by the pre-existing arrest warrant." *Id.* at 242.

Here, the first and third *Brown* factors favor suppression of the evidence. *See Brown*, 422 U.S. at 603–604. The parties agree that very little time elapsed between the seizure of the key and the discovery of the gun in the car. And while we do not view the officers as acting with flagrant disregard for the law, we also cannot conclude that they acted on a reasonable but mistaken belief that Baker had consented to their actions. *See, e.g.*, *Strieff*, 579 U.S. at 241–42 (concluding exclusion of evidence would not serve deterrent

purpose where officer's detention arose out of "good-faith mistakes"); *United States v. Boone*, 62 F.3d 323, 325 (10th Cir. 1995) (officer's "mistaken belief" that the defendant had consented to a search did not qualify as "flagrant misconduct").  No reasonable interpretation of the record suggests that Baker consented to, or even was equivocal about, the officers taking the car key off his belt. The record clearly demonstrates that Officer Byun removed the car key from Baker's belt loop during the patdown without asking for permission or consent.  We have held that suppression is favored where an officer violates the law "with the purpose of extracting evidence against the defendant." *United States v. Washington*, 387 F.3d 1060, 1075 (9th Cir. 2004).  The officers' conduct following the patdown of Baker was plainly "investigatory," an "expedition for evidence in the hope that something might turn up." *See Brown*, 422 U.S. at 605.  The record contains no other explanation for their actions, and the Government has identified none.

The Government instead emphasizes the second *Brown* factor, arguing that Baker's flight as officers attempted to handcuff him was an intervening circumstance that attenuated the taint of any illegal misconduct.  Citing our decisions in *United States v. Garcia*, 516 F.2d 318, 319–20 (9th Cir. 1975), and *United States v. McClendon*, 713 F.3d 1211, 1214 (9th Cir. 2013), the Government urges that "flight, on its own, triggers attenuation."  The district court relied on the same cases to conclude Baker's flight was an intervening circumstance that attenuated the connection between the officers' conduct and the discovery of the gun. The district court found "there was reasonable suspicion to detain [Baker] which ripened [into] probable cause when he fled, and that permitted the officers to observe the gun in the

car." These arguments misapprehend the attenuation doctrine.

Baker's flight from police does not qualify as an intervening circumstance because the red Buick was discovered as a consequence of the officers' misconduct *before* Baker fled from officers. The relevant inquiry for attenuation is not whether illegal police conduct was "part of a series of facts" culminating in the discovery of challenged evidence, but whether the evidence was obtained "by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Garcia*, 516 F.2d at 319 (quoting *Wong Sun*, 371 U.S. at 488). The officers' means of discovering the handgun cannot be distinguished from their illegal conduct: they discovered the handgun by seizing the car key from Baker, using the key to identify the Buick parked nearby, and then searching that Buick, in clear causal succession. *See United States v. Chamberlin*, 644 F.2d 1262, 1269 (9th Cir. 1980) (evidence is excludable where officers' "illegal activity tends to significantly direct the investigation to the evidence in question").

We have never held that a defendant's flight from law enforcement always attenuates the taint of an officer's prior illegal conduct regardless of the circumstances. Rather, where we have found flight to satisfy the attenuation doctrine, the circumstances of that flight have provided independent grounds for discovering the challenged evidence such that the officer's prior illegal conduct was not the sole reason for the discovery of the evidence. In *Garcia*, an officer directed a driver to stop at a checkpoint. 516 F.2d at 319. Instead of complying, the driver sped off. *Id.* Following a high-speed chase, officers stopped the driver and arrested him, finding contraband in the car in a search

incident to his arrest.  *Id.*  We affirmed the denial of the driver's motion to suppress, concluding that even if the initial checkpoint stop had been illegal, the driver's flight and ensuing high-speed chase supplied officers with the requisite "probable cause to arrest [the driver] and then to search his car."  *Id.* at 320.

The flight in *Garcia*, along with other untainted evidence about the defendant's suspicious behavior, gave the officers a basis independent from the illegal checkpoint stop to effectuate an arrest and search the defendant's car.  *Id.*  In other words, the illegal stop in *Garcia* proved to be no more than "part of a series of facts" leading up to the discovery of contraband in the car.  *Id.*  Here, however, the officers' illegal seizure of the key was the sole reason for the discovery of the car.  Baker's flight played no role in the identification of the red Buick or its eventual search and therefore could not purge the taint of the prior illegal conduct.[4]  The car was located by officers before Baker fled. It was after Baker was taken into custody that a different officer observed what appeared to be the butt of a handgun protruding from underneath the front car seat.  Because the key had been lost during the foot pursuit, officers opened the car with a baton and recovered the handgun.  To the extent the district court found that Baker's flight gave officers grounds to identify the Buick or to search it, it is unsupported by the record.

---

[4] *Garcia* does not suggest that if the arrestee had been on foot, his flight would have supplied officers with justification to search for evidence against him in a car—or, for that matter, in any place other than the location of his arrest.  *See Preston v. United States*, 376 U.S. 364, 367 (1964) ("Once an accused is under arrest and in custody, then a search made at another place, without a warrant, is simply not incident to the arrest.").

For similar reasons, *McClendon* does not support the Government's position.  There, officers found a backpack in a parked car belonging to the defendant and searched it, discovering a firearm and ammunition.  713 F.3d at 1213. Officers then located a man matching McClendon's description and ordered him to stop.  *Id.*  McClendon continued walking away and discarded an object from his waistband.  *Id.* at 1213–14.  Police arrested McClendon and found a loaded handgun a few feet away.  *Id.* at 1214.  We affirmed the denial of a motion to suppress the handgun evidence. *Id.* at 1218.  Assuming the search of the backpack had been illegal, we concluded the search was not the but-for cause of the discovery of the handgun because police would have searched for McClendon for other reasons.  *Id.* at 1217–18.  Even if police were motivated to search for McClendon based on the illegal search of the backpack, we also concluded that McClendon's decision to flee was an intervening event that purged the taint from the original search.  *Id.* at 1218 (citing *Garcia*, 516 F.2d at 319–20). Stated another way, even if the backpack search was a but-for cause of the officers' discovery of the handgun, the flight during which McClendon discarded the gun moments before his arrest interrupted the chain of events leading to the gun's discovery. *See id.*  Baker's flight, by contrast, did not alter the sequence of events in which the officers illegally seized the key, identified the red Buick, and searched it.  *See id.* Simply put, the handgun evidence was obtained "by exploitation of that illegality."  *Garcia*, 516 F.2d at 319 (quoting *Wong Sun*, 371 U.S. at 488).

The Government has not met its burden to show attenuation between the illegal search and seizure and the discovery of the handgun evidence.

## C.

The Government contends that even if admission of the handgun was in error, the error was harmless. Before we can hold a constitutional error harmless as to a particular conviction, we must determine whether the Government has met its burden of showing beyond a reasonable doubt that the error did not contribute to the conviction. *Chapman v. California*, 386 U.S. 18, 24 (1967). Where the trial court errs in admitting evidence obtained in violation of the Fourth Amendment, we "review[] the remainder of the evidence against the defendant" to determine whether there is any reasonable doubt that the jury would have convicted the defendant absent the erroneously admitted evidence. *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991). That is a demanding standard but does not erect "a barrier so high that it could never be surmounted." *Neder v. United States*, 527 U.S. 1, 18 (1999).

We conclude the Government has demonstrated beyond a reasonable doubt that the jury would have convicted Baker of robbery and conspiracy to commit robbery in violation of 18 U.S.C. § 1951(a) based on substantial independent evidence establishing Baker's involvement in the robbery. However, there is reasonable doubt whether the jury would have convicted Baker of brandishing a firearm in violation of 18 U.S.C. § 924(c) absent the admission of the handgun, and we accordingly vacate his conviction of this count.

The Hobbs Act provides for the punishment of "[w]hoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do." 18 U.S.C. § 1951(a). In relevant part, the Act defines robbery as "the unlawful taking or obtaining of

personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury, immediate or future." *Id.* § 1951(b)(1).

The evidence that Baker committed robbery and conspiracy in violation of the Hobbs Act was substantial. A Sprint employee testified at trial that the robber took phones with a total value of approximately $30,000 and that the robbed store was closed for the remainder of the day, establishing that the robbery affected interstate commerce. Surveillance video and testimony of the non-involved Sprint employee established that a gunman entered the store, directed co-defendant Beatty to fill a duffle bag with phones, and held the other employee at gunpoint as Beatty did so, establishing the unlawful taking of personal property by force. *See* 18 U.S.C. § 1951(b)(1).

Beatty testified that Baker was the gunman who committed this robbery. Beatty described their conspiracy in detail, explaining that Baker came up with the idea to rob the store while Beatty pretended to be a victim, that the two men spoke four or five times in the two weeks before the robbery to finalize their plan, and that they met following the robbery to divvy up the stolen iPhones, which they went on to sell. In addition to Beatty's testimony, Baker's phone records showed a series of phone calls between Baker and Beatty the evening of the robbery, including one call an hour and five minutes before the robbery, another call sixteen minutes before the robbery, and five calls in the three hours after the robbery. CSLI was admitted to show Baker's movement toward the Sprint store before the robbery and away from the store afterward, and the surveillance video of the robbery showed the robber wearing clothing that appeared to match clothing worn by Baker in Facebook

photos. In view of the remaining evidence in the record, we conclude there is no reasonable doubt the jury would have found Baker guilty of Hobbs Act robbery and conspiracy even without the handgun evidence. *See Chapman*, 386 U.S. at 24.

The brandishing conviction is a different matter. In relevant part, 18 U.S.C. § 924(c)(1)(A)(i) provides for a sentence of "not less than 5 years" for "any person who, during and in relation to any crime of violence … uses or carries a firearm." "[I]f the firearm is brandished," such person shall "be sentenced to a term of imprisonment of not less than 7 years." 18 U.S.C. § 924(c)(1)(A)(ii). To convict under § 924(c), the Government was required to prove the firearm Baker used was real. *See United States v. Garrido*, 596 F.3d 613, 617 (9th Cir. 2010). As the district court instructed, a "real firearm" under § 924(c) is a weapon that "expel[s] a projectile by the action of an explosive," and "[t]oys, replicas, antiques," and "blank firing prop gun[s]" do not qualify. The jury returned a guilty verdict on the § 924(c) count, finding that Baker knowingly possessed a firearm in furtherance of the robbery and knowingly used, carried, and brandished a firearm during and in relation to the crime.

There is reasonable doubt whether the jury would have convicted Baker under § 924(c) had the district court excluded the gun recovered from the car. Evidence at trial suggested that the gun Baker used in the robbery was not real. Beatty testified that before the robbery, Baker told him "he was going to use a fake firearm." Beatty further testified that he could not verify whether the gun Baker used during the robbery was real because Beatty never touched it. Surveillance video of the robbery could not independently establish whether the gun used was real or a replica. The

Government contends that the gun in the video did not "appear[] fake," but that is precisely the purpose of replicas.

In addition, the handgun evidence was central to the Government's case that Baker violated § 924(c).  During opening argument, the prosecution stressed that the "silver and black semi-automatic handgun" recovered from "inside the vehicle the defendant was using" matched the gun used in the Sprint store robbery.  A special agent testified that he examined the gun recovered by police and confirmed it was real, and an LAPD detective commented for the jury on the similarities between the recovered gun and the gun featured in the surveillance video.  The prosecution's closing argument repeatedly emphasized that the real gun admitted into evidence and the gun used in the robbery were one and the same, urging the jury to find that Baker "was found in possession of that very real gun, that unique, very real gun that was used during the Sprint store robbery."  On this record, it cannot be said that the admission of the gun was "harmless beyond a reasonable doubt" as to Baker's conviction under § 924(c).  *See Chapman*, 386 U.S. at 24; *Fulminante*, 499 U.S. at 310.

## III.

Finally, Baker raises several claims of error concerning the admissibility of other evidence at trial and the district court's imposition of an obstruction of justice sentencing enhancement.  We review preserved challenges to evidentiary rulings for abuse of discretion and unpreserved challenges to evidentiary rulings for plain error.  *United States v. Orm Hieng*, 679 F.3d 1131, 1135 (9th Cir. 2012).  We find no error in these determinations.

## A.

Baker contends that the district court erred in admitting the testimony of the Government's cell data mapping expert. Federal Rule of Evidence 702 "assign[s] to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 597 (1993). In evaluating the admissibility of expert testimony, the district court considers whether the witness's "theory or technique … can be (and has been) tested"; whether it "has been subjected to peer review and publication"; its "known or potential rate of error"; "the existence and maintenance of standards controlling the technique's operation"; and whether it has attracted "[w]idespread acceptance" within a relevant scientific community. *Id.* at 593–94.

At trial, the Government proffered the testimony of CSLI expert Bennett, who explained how information about the cell towers to which Baker's phone connected on the evening of the robbery allowed him to discern the phone's movement toward the Sprint store before the robbery and away from it afterward. Baker concedes that expert testimony about CSLI "has been admitted in district court[s] across the country." He argues, however, that the district court abused its discretion in admitting such testimony on the ground that "[n]either the court nor the government appropriately circumscribed the import of the historical cell tower data" by explaining that CSLI shows a phone's location within a range rather than pinpointing it exactly. The Government argues that Baker failed to object to Bennett's testimony on this ground at trial and his challenge is therefore subject to plain error review. We conclude that Baker's challenge fails under either abuse of discretion or plain error review.

Baker relies on the Seventh Circuit case *United States v. Hill*, 818 F.3d 289, 299 (7th Cir. 2016), which "caution[ed] the government not to present historical cell-site evidence without clearly indicating the level of precision—or imprecision—with which that particular evidence pinpoints a person's location at a given time." *Hill* concluded that the challenged expert testimony in the case "made the jury aware … of the relative imprecision" of CSLI, and that its admission "was therefore not an abuse of the district court's considerable discretion." *Id.* at 299. So too here. Bennett explained that CSLI can show "where a phone was in a general sense at [a given] time," and he described how he used this data to conclude that "the defendant's phone move[d] from one area of Los Angeles to the area, general area of the crime scene at the approximate time the crime happened and then move[d] away." He confirmed the limitations of CSLI on cross-examination. Because the jury was adequately informed of the limitations of CSLI, the district court's decision to admit Bennett's testimony was not erroneous under any standard. *See Orm Hieng*, 679 F.3d at 1135.

**B.**

Baker challenges the exclusion of a report by the Department of Commerce's National Institute of Standards and Technology ("NIST") on guidelines for mobile device forensics, which defense counsel sought to introduce while cross-examining the Government's CSLI expert. The prosecution objected to the introduction of the report on grounds that it lacked foundation and is hearsay, objections

the court sustained.[5]    We review Baker's preserved challenge to the district court's evidentiary ruling for abuse of discretion. *See Orm Hieng*, 679 F.3d at 1135.

Baker concedes that the NIST report is hearsay but argues it was admissible under the public records exception to hearsay. "As a general rule, a party is prohibited from introducing a statement made by an out-of-court declarant when it is offered at trial to prove the truth of the matter asserted." *United States v. Torres*, 794 F.3d 1053, 1059 (9th Cir. 2015) (citing Fed. R. Evid. 801(c), 802)). Under the public records exception, "[a] record or statement of a public office" is admissible if it sets forth "the office's activities"; is "a matter observed while under a legal duty to report, but not including, in a criminal case, a matter observed by law-enforcement personnel"; or, "in a civil case or against the government in a criminal case, [pertains to] factual findings from a legally authorized investigation." Fed. R. Evid. 803(8)(A)(i), (ii), (iii).

The only potentially applicable public records exception is a record or statement that sets forth an "office's activities," but that is not the function of the NIST report in question. Its stated purpose is to "provid[e] an in-depth look into mobile devices and explain[] technologies involved and their relationship to forensic procedures," and to "discuss[] procedures for the validation, preservation, acquisition, examination, analysis, and reporting of digital information." None of these purposes describes the activities of the

---

[5] On appeal, Baker argues that the NIST report was self-authenticating under Federal Rule of Evidence 902(5). The Government concedes as much for purposes of this appeal, but correctly points out that authenticity does not establish admissibility. *See Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 776 (9th Cir. 2002).

National Institute of Standards and Technology. The district court did not abuse its discretion in denying admission of this report.

## C.

Baker contends that the trial testimony of Baker's co-defendant Beatty was insufficient to support the factual finding that Baker threatened Beatty, and that the district court therefore erred in applying an obstruction of justice sentencing enhancement. We review the district court's application of the Sentencing Guidelines to the facts of a case for abuse of discretion. *United States v. Gasca-Ruiz*, 852 F.3d 1167, 1170 (9th Cir. 2017) (en banc). "A factual finding that a defendant obstructed justice is reviewed for clear error." *United States v. Garro*, 517 F.3d 1163, 1171 (9th Cir. 2008) (citing *United States v. Jimenez*, 300 F.3d 1166, 1170 (9th Cir. 2002)). The district court's determination that Baker committed obstructive conduct was not clearly erroneous.

The Sentencing Guidelines direct district courts to apply a two-level sentencing enhancement if "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction," including by "threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so." U.S.S.G. § 3C1.1; U.S.S.G. § 3C1.1 app. n.4.

Beatty testified that while the two men were in custody at the same detention center, Baker told Beatty that Baker "better not find out [Beatty was] testifying because [Baker] knows where [Beatty's] family stays." Beatty also testified

that he and Baker could not "get face-to-face" at the time of the alleged threat, as they were not housed in the same dorm. On appeal, Baker argues that Beatty was impeached by his statement that he was not "face-to-face" with Baker when the alleged threat was made, and that the district court's factual finding that Baker threatened Beatty was therefore clearly erroneous.

Beatty's statement that Baker threatened him is not irreconcilable with his statement that they did not come face-to-face. *See Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573–74 (1985) (a district court's account of the evidence is not clearly erroneous if it "is plausible in light of the record viewed in its entirety"). A witness who was housed in Beatty's dorm at the detention center testified that the witness and Baker had multiple conversations from opposite sides of a door rather than face-to-face, indicating that real-time communication with those housed in other dorms was possible. Baker alternatively might have threatened Beatty in writing. Although the manner of the threat was not fully articulated at trial, the district court did not commit clear error in choosing between permissible views of the evidence to conclude Baker committed obstructive conduct. *See United States v. Barbosa*, 906 F.2d 1366, 1370 (9th Cir. 1990) ("[A] court reviewing the imposition of a sentence under the Guidelines should give 'due regard to the opportunity of the district court to judge the credibility of the witnesses.'" (quoting 18 U.S.C. § 3742(e))).

## IV.

Evidence of the handgun should have been suppressed at trial as fruit of an illegal search and seizure by the LAPD. We hold that this error was prejudicial as to Baker's firearm

brandishing conviction under 18 U.S.C. § 924(c), but was harmless as to his convictions for Hobbs Act robbery and conspiracy under 18 U.S.C. § 1951(a). We reject the other claims of error and affirm the convictions under 18 U.S.C. § 1951(a) and sentencing enhancement under U.S.S.G. § 3C1.1, reverse the conviction under 18 U.S.C. § 924(c), and remand for a reduction in sentence or retrial on that count.

**AFFIRMED in part, REVERSED in part, and REMANDED.**